WILBUR GERMAN *et al.*, Plaintiffs-Appellees, *v.* ILLINOIS POWER COMPANY, Defendant-Appellant.

Fifth District   Nos. 82—175, 82—272 cons.

Opinion filed June 10, 1983.

Gundlach, Lee, Eggmann, Boyle & Roessler, of Belleville (Richard F. Nash and James Neville, of counsel), for appellant.

Cook, Shevlin, Keefe & Chatham, Ltd., of Belleville, and Rammel, Kamp, Bradney, Hall, Daham & Kuster, of Jacksonville (Bruce N. Cook, of counsel), for appellees.

JUSTICE KARNS delivered the opinion of the court:

Plaintiff, Wilbur German, was severely injured when the metal fork of the hoist he was operating came into contact with high-voltage electrical lines owned by defendant, Illinois Power Company (IPC). Plaintiff sued, alleging several acts of negligence of which the following were submitted to the jury: whether defendant was negligent in

failing to warn that the electrical lines were high-voltage lines; whether defendant was negligent in failing to warn persons in the vicinity of the lines that the covering was not insulation; and whether defendant was negligent in failing adequately to advise persons that they should request line protectors before working near electrical lines.

The jury, under the comparative negligence doctrine of *Alvis v. Ribar* (1981), 85 Ill. 2d 1, 421 N.E.2d 886, returned a verdict for plaintiff and fixed plaintiff's damages at $1,125,000. It found that plaintiff's contributory negligence was 50% of the cause of the accident and judgment was entered for plaintiff for $562,500. Subsequently, plaintiff's wife brought suit to recover damages for loss of consortium. The circuit court granted summary judgment for Mrs. German on the issue of liability; defendant appeals from both decisions.

In March of 1979, plaintiff contracted with the Armstrong-Andrews Company (A.A.Co.) to repair the roof of a 40-year-old, three-story warehouse. Although plaintiff had 15 years' experience as a journeyman roofer, this was his first job as an independent roofing contractor. Plaintiff inspected the roof and surrounding area two weeks before he was to begin work. He noticed that the south side of the building was equipped with a railroad spur and loading dock and felt it would be an ideal location for setting up his equipment. The north side was rented to a trucking company. At the west end, the roof of the building was substantially lower, necessitating two lifts to get material to the higher roof. The south end of the east side was cluttered with debris.

Defendant's electrical lines were located on the east side of the building. The lines angled from south to north, becoming as close as four feet eight inches at the northeast corner of the building where they were attached to a pole. The lines were 30 feet from ground level and 11 feet below the roof. They were installed by IPC in 1929.

Plaintiff began working on March 30. After being told by an employee of A.A.Co. that the company would be using the south side of the building, plaintiff felt his only choice was to set up his equipment on the east side. He located his supplies and his hoist, a gasoline-powered device used to lift material to the roof, about 10 feet south of the northeast corner. At this point the electrical lines were six feet nine inches from the building. The boom of the hoist, to which was attached a metal cable and fork, extended four feet two inches over the edge of the roof. Plaintiff estimated that even when the hoist was in operation, the boom cleared the lines by "at least two feet."

Plaintiff did not contact defendant about his decision to work near the lines. Plaintiff testified that he believed the lines were low-voltage utility lines and because they were covered, he felt they were insulated and thus felt no danger in working in their vicinity.

To lift supplies to the roof, plaintiff operated the hoist from the roof while his brother-in-law loaded the supplies at ground level. Plaintiff's father-in-law and son worked to remove supplies lifted to the roof. The four made numerous lifts without experiencing any trouble with the electrical lines, although plaintiff had to stop the hoist and steady the fork several times because of high gusts of wind.

About 10:30 that morning, plaintiff's brother-in-law, Robert E. Culp, was shocked when he grabbed the metal cable as it swung loose. Apparently, he pulled the cable back so that it made contact with the electrical lines. The shock was not severe, although Culp's gloves were burned. When Culp informed plaintiff of the shock, plaintiff stopped the hoist and took a closer look at the lines. He noticed gaps in the material covering the lines and concluded that the cable must have come in contact with a bare spot. He moved the hoist several feet so that it was located where the covering was intact, and the four men continued to work. About a half hour later, while plaintiff was in the process of lowering the fork to the ground for another load, a gust of wind caught the fork, blowing it into the electrical lines. Plaintiff was instantly shocked by the current in the 12,000-volt electrical system, resulting in severe injuries.

Defendant's employees investigated the accident shortly after its occurrence. Lerton Krushas, area service manager for IPC, examined the lines and concluded that they were insulated. However, it was later determined that the lines were covered with a weatherproofing material, a substance which has no insulating capacity. At trial, several other IPC employees referred to the lines as insulated and an exhibit prepared by a company employee noted that "insulation on underside of C O conductor revealed signs of being slightly melted." It was acknowledged that the public is unable to distinguish between insulated and weatherproofed lines. Defendant is presently phasing out the use of the weatherproofing material. The lines had serviced the building since it was built and were initially erected some 40 years prior to the accident.

There was extensive evidence at trial concerning defendant's attempts to protect the public from the dangers of electricity. IPC employees testified that high-voltage electrical lines are not insulated because of the excessive weight the insulation creates but rather are located high above ground level where the public is unlikely to come

into contact with the lines. They testified that warning signs are not placed on high-voltage lines or on the poles supporting the lines because they are considered a hazard to linemen and can become energized themselves. In addition, the absence of a warning sign at any one point might give persons near the line a false sense of security. Warning signs are used at ground level substations and to indicate the presence of underground lines because in these cases public contact is much more likely.

In order to protect those who are required to work near electrical lines, defendant provides temporary safety devices such as line guards or protective hoses or will temporarily relocate, remove or de-energize the lines. In addition, IPC employees are instructed to advise anyone they see working near electrical lines of the protective measures available. Defendant informs contractors of these services through periodic meetings and through advertising. Several of defendant's employees testified that area contractors are aware of the safety measures; although, it was admitted that residential roofers, rather than commercial roofers, are generally present at the meetings. John Urbance, the area engineering supervisor for IPC, testified that during the two years preceding plaintiff's injury the company had over 100 requests from contractors for temporary safety services.

Finally, it was uncontradicted that defendant was not in violation of any statute or national, State or local safety standard. Defendant was in compliance with an Illinois Commerce Commission standard requiring electrical lines to be at least three feet from any structure. There was no evidence of standards requiring warning signs on high-voltage electrical lines.

Defendant argues that during closing argument to the jury, plaintiffs' counsel made several inflammatory comments aimed solely at arousing the prejudice of the jury. As a result of these improper comments and the fact that plaintiff broke down, cried and had to be removed from the courtroom during counsel's argument, defendant claims he was denied a fair trial.

Defendant also objects to the damages instruction given by the court. The instruction advised the jury that it could consider five elements of damages in fixing the amount of plaintiffs' recovery. Defendant claims that according to the supreme court decision in *Powers v. Illinois Central Gulf R.R. Co.* (1982), 91 Ill. 2d 375, 438 N.E.2d 152, the instruction is erroneous because it listed "the nature, extent and duration of the injury" as a separate element of damages.

Finally, defendant argues that the judgment must be reversed because the jury's verdict was a quotient verdict.

The first issue raised on appeal concerns defendant's duty of care. Defendant argues that it owed no duty of care to plaintiff or if there was a duty, that it was only of ordinary care. Thus, defendant claims the court's instruction to the jury that a high degree of care was owed to plaintiff was error.

Defendant argues that it owed no duty of care to plaintiff. However, in *Merlo v. Public Service Co.* (1943), 381 Ill. 300, 45 N.E.2d 665, the court stated:

"[A]n electric company using highly charged wires owes the legal duty toward every person who, in the exercise of a lawful occupation in a place where he has a legal right to be, whether for business, pleasure or convenience, is liable to come in contact with the wires to see that such wires are properly placed with reference to the safety of such persons and are properly insulated. (18 Am. Jur. p. 485.) There is nothing more than the ordinary care required under the circumstances when put into practice. The reason for requiring insulation and vigilance in maintaining the wires in proper condition is the deadly and dangerous power of the current carried along such wires." 381 Ill. 300, 314-15, 45 N.E.2d 665, 674.

In *Merlo* plaintiffs' decedents were electrocuted when the boom of a crane came in contact with an uninsulated high-voltage line, covered only with weatherproofing, which was erected over a parkway, part of the public streets in Maywood. The court stated that it could be anticipated that men would be working in the streets; therefore, the defendant, Public Service Company, owed a duty to the workmen to insulate and properly maintain the electric lines to protect them from injury in the event they came in contact with the lines.

The plaintiff does not claim that defendant had a duty to insulate these lines, and the defendant was not charged with negligence for failing to do so. Highly energized lines are customarily not insulated.

Plaintiff does argue that defendant had a duty to warn that these highly energized lines, that appeared to be insulated, were uninsulated, high-voltage lines, where the lines were erected parallel to the side of the building and in close proximity to the building.

We agree with plaintiff. The question of "duty" in these difficult cases is a vexing one. (See *Renslow v. Mennonite Hospital* (1977), 67 Ill. 2d 348, 367 N.E.2d 1250.) The unusual facts of this case distinguish it from such cases as *Genaust v. Illinois Power Co.* (1976), 62 Ill. 2d 456, 343 N.E.2d 465, which we note, was not a negligence case but one predicated on strict liability in tort. We cannot say that it was unforeseeable nor that the defendant could not reasonably expect that

some person rightfully on the roof of the building, as was the plaintiff here, might come into contact with these lines which appeared to be insulated, low-voltage power lines.

While it is true that the plaintiff knew these lines were energized, because of their appearance as being insulated he assumed that they were low-voltage lines that posed no great danger because they were insulated. Furthermore, the jury determined that his conduct was negligent and attributed 50% of the accident to his own contributory negligence. This case does not involve injuries to a person who claimed to be unaware of the dangers of electricity.

For these same reasons, we believe this case is distinguishable from *Clinton v. Commonwealth Edison Co.* (1976), 36 Ill. App. 3d 1064, 344 N.E.2d 509, which involved contact by a 25-foot aluminum radio antenna with an uninsulated high-voltage, copper wire 22½ feet off the ground, in compliance with Illinois Commerce Commission regulations, which, as the court noted in *Merlo*, is not determinative of defendant's negligence.

We realize that this case may be distinguished from *Burke v. Illinois Power Co.* (1978), 57 Ill. App. 3d 498, 373 N.E.2d 1354, and *McGill v. Illinois Power Co.* (1959), 18 Ill. 2d 242, 163 N.E.2d 454, where the court found that actual knowledge on the part of the power company that workmen were in a potentially perilous situation while working near highly energized, uninsulated lines gave rise to a duty to warn or take other precautions for their safety. Here, IPC had no actual knowledge that plaintiff was working on the roof of this building. It is also true that IPC had undertaken extensive advertising to inform contractors and the general public of the dangers of all electrical lines, high and low voltage, and had available various services to protect persons who might be required to work in proximity to electrical lines.

■ We also must acknowledge that the use of braided, weatherproof covering on high-voltage electrical lines was commonplace. (*Austin v. Public Service Co.* (1921), 299 Ill. 112, 118, 132 N.E. 458, 461; *Merlo v. Public Service Co.* (1943), 381 Ill. 300, 313, 45 N.E.2d 665, 673.) It has been suggested that where a power company knows, or has reason to know, that there is a danger that persons might come into contact with high-voltage lines, there may be a duty to warn that the weatherproof covering which gives a deceptive appearance of insulation, is not insulation and that such wires are uninsulated and carry high voltage. (*Croxton v. Duke Power Co.* (4th Cir. 1950), 181 F.2d 306.) We believe this duty existed under the unusual facts present here.

The high-voltage electric lines were installed in 1929. They ran in close proximity to the side of the building on which plaintiff was working. Numerous cases state that an electric company has a duty to insulate its lines or to warn if not insulated whenever it may be reasonably anticipated that persons may come into contact with them. (See cases collected in Annot., 69 A.L.R.2d 9 (1960).) We cannot say as a matter of law that the defendant could not reasonably be expected to anticipate that some workman employed in or about this large commercial building might in some manner come in contact with these lines.

Additionally, here the lines appeared to be insulated. Plaintiff thought they were insulated; in fact, supervisory employees of the defendant thought they were insulated. Weatherpoof, protective covering on highly energized lines is no longer used, for the obvious reason that it appears to be insulation.

It would appear from the evidence that it is impractical to insulate high-voltage lines because of the weight of the insulation that would be required to accomplish this purpose. Because of this, the defendant should not cover the lines with a material that appears, even to its employees, to be insulation without providing adequate warning to the public. *Heyer v. Jersey Cent. Power & Light Co.* (1929), 106 N.J.L. 211, 147 A. 452.

■ Defendant further argues that if it had a duty of care to plaintiff, the duty was one to use ordinary care, not a "high degree of care." Over the objection of defendant, the jury was instructed that IPC had a duty to use a high degree of care for the safety of the plaintiff. The jury was told that a "high degree of care" was "the degree of care commensurate with the known danger involved in the distribution of electricity which a reasonably careful person would use under circumstances similar to those shown by the evidence." At the instruction conference, plaintiff advised the court that these instructions were adopted from those given and from language appearing in *Burke v. Illinois Power Co.* (1978), 57 Ill. App. 3d 498, 373 N.E.2d 1354. In *Burke,* however, the duty of a distributor of electrical energy was not discussed in the context of proper instructions to the jury, which, apparently, was not an issue in the case.

While we know of no Illinois case that has discussed or approved instructions in the form given here, language like that incorporated in the instructions has appeared in numerous cases. Thus, in *McGill v. Illinois Power Co.* (1959), 18 Ill. 2d 242, 245, 163 N.E.2d 454, 456, the supreme court stated that the "hazardous enterprise of distributing electrical energy" requires a high degree of care. In *Haberman v.*

*Commonwealth Edison Co.* (1980), 84 Ill. App. 3d 475, 405 N.E.2d 830, the court stated that Edison, as a supplier of electrical energy, was required to exercise a high degree of care.

It would appear to be the general rule in this country that a power company is held to a high degree of care in connection with the distribution of electrical energy (see cases collected at Annot., 69 A.L.R.2d 9 (1960)). Professor Prosser states that suppliers of electricity "must exercise a great amount of care because the risk is great." (Prosser, Torts sec. 34, at 180 (4th ed. 1971)); however, the standard is still one of negligence and "[w]hat is required is merely the conduct of the reasonable man of ordinary prudence under the circumstances, and the greater danger, or the greater responsibility, is merely one of the circumstances, demanding only an increased amount of care." (Prosser, Torts sec. 34, at 181 (4th ed. 1971).) Prosser continues by noting that some courts instruct the jury in terms of a "high degree" of care when all they mean to say is that greater or less care is required under some circumstances. He states, "[t]echnically the 'high degree' instruction is incorrect, as a matter of principle; but it is not likely ever really to mislead the jury, and almost never can be called prejudicial." Prosser, Torts sec. 34, at 181 (4th ed. 1971).

In *Austin v. Public Service Co.* (1921), 299 Ill. 112, 118, 132 N.E. 458, 460, the court stated that a distributor of electric power, because of the deadly force of electricity, "is bound to exercise care corresponding to the dangers incident to its use" which is "such care and caution as a person of ordinary prudence might be expected to exercise in the handling of such a silent and dangerous agency under similar circumstances." This definition of negligence is incorporated into Illinois Pattern Jury Instruction (IPI), Civil, No. 10.01 (2d ed. 1971), which defines negligence in terms of what a reasonably careful person would do under circumstances shown by the evidence.

Considering the dangerous nature of electricity, the "circumstances" here present, reasonable care would seem to be the same as a high degree of care. (See Annot., 32 A.L.R.2d 244, 247 (1953).) We believe it would have been proper to instruct the jury in the language of Illinois Pattern Jury Instructions; however, the jury here was told, in essence, that a high degree of care was that which a reasonably careful person would use under the circumstances present, the distribution of electricity. This was an accurate statement of the law, and we agree with Professor Prosser that it was not likely to mislead the jury and could not be considered prejudicial.

■ The defendant argues that the damage instruction, which listed "nature, extent and duration of the injury" as a separately

compensable element of damages, was improper under *Powers v. Illinois Central Gulf R.R. Co.* (1982), 91 Ill. 2d 375, 438 N.E.2d 152. Defendant argues that it is entitled to a new trial on damages, should the court not reverse on other grounds assigned as error. The damage instruction given was IPI Civil, Nos. 30.01, 30.02 (2d ed. 1971). In *Powers*, however, the jury was given an itemized verdict form which directed the jury to compensate plaintiff for the "nature, extent and duration" of his injuries should the jury determine the issue of liability in plaintiff's favor. There the duplicative nature of the award was obvious, here it is not, as the jury returned a general verdict fixing plaintiff's damages. We simply do not believe that the holding in *Powers* is applicable here, particularly where the defendant has not argued that the total award of damages was excessive, and it is impossible to determine what part of that award was attributed to the nature, extent and duration of plaintiff's injuries. The jury may well have "considered" the nature, extent and duration of plaintiff's injuries without fixing an amount as a separate element of damages.

█ We have examined closely plaintiff's argument to the jury and do not find any indication that plaintiff ever accused the defendant of intentionally injuring the plaintiff. Defendant made no objection to the remarks he now argues were improper. Plaintiff's argument was certainly forceful, but it was not prejudicially improper. We find nothing in plaintiff's argument of the kind this court condemned in *Manninger v. Chicago & Northwestern Transportation Co.* (1978), 64 Ill. App. 3d 719, 381 N.E.2d 383.

█ After plaintiff's involuntary crying, he was immediately led from the courtroom by co-counsel. The trial court determined that this sudden outburst did not prejudicially influence the jury's ability to determine the issues in the case. (*Nowakowski v. Hoppe Tire Co.* (1976), 39 Ill. App. 3d 155, 159, 349 N.E.2d 578, 583.) We cannot say that the denial of defendant's motion for mistrial was an abuse of discretion or that this isolated incident so prejudiced the defendant as to warrant a new trial.

█ Defendant's last assignment of error involves an alleged quotient verdict. After the jury returned its verdict, papers were found in the jury room containing 12 numbers which when averaged produced a figure of $1,125,000 and a figure of 50%. When a jury agrees in advance to arrive at a verdict by averaging, the verdict so rendered is improper. (*Illinois Central R.R. Co. v. Able* (1871), 59 Ill. 131.) There must be evidence, however, that the jury agrees to be bound by the average figure; the jury may experiment by considering average figures. (*Kelley v. Call* (1944), 324 Ill. App. 143, 57 N.E.2d 501.) Here

there was no proof that the jury agreed in advance to a quotient verdict or what use was made of the figures written on the papers. The jury was polled, and each member affirmed that the verdict was his or her verdict. (*City of Pekin v. Winkel* (1875), 77 Ill. 56.) We would not be warranted in disturbing the verdict of the jury on such tenuous grounds.

In defendant's separate appeal of the summary judgment granted Alice German, it does not argue that summary judgment was improper, on principles of *res judicata,* should we affirm the judgment in Wilbur German's case. As we have done so, we need not consider the procedural matter raised in Alice German's appeal.

The judgments of the circuit court of St. Clair County in cause No. 82–175 and in cause No. 82–272 are affirmed.

Affirmed.

HARRISON, P.J., and KASSERMAN, J., concur.