Anne NEEDHAM, Plaintiff–Appellee,
Cross–Appellant,

v.

WHITE LABORATORIES, INC.,
Defendant–Appellant,
Cross–Appellee.

Nos. 87–1379, 87–1842 and 87–1872.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 26, 1988.

Decided May 16, 1988.

Rehearing and Rehearing En Banc
Denied June 16, 1988.

Henry R. Simon, Law Office of Henry R. Simon, Newark, N.J., for defendant-appellant, cross-appellee.

Thomas H. Bleakly, David A. Novoselsky & Assoc., Chicago, Ill., for plaintiff-appellee, cross-appellant.

Before BAUER, Chief Judge, POSNER, Circuit Judge, and PELL, Senior Circuit Judge.

POSNER, Circuit Judge.

Anne Needham brought this products liability suit against White Laboratories, basing federal jurisdiction on diversity of citizenship, and after a jury trial obtained a judgment for $800,000. White Laboratories appeals from the judgment. Needham cross-appeals, seeking a new trial on damages or, alternatively, additional interest on the judgment.

In 1952 Anne Needham's mother, while pregnant with her, used a prescription drug manufactured by White Laboratories—dienestrol—to prevent a miscarriage. Dienestrol is a synthetic estrogen similar to the better-known DES (diethylstilbestrol). In

1974 Anne Needham developed clear-cell adenocarcinoma, a vaginal cancer that is substantially more common among women whose mothers received estrogen treatments during pregnancy than among other women. See Melnick et al., *Rates and Risks of Diethylstilbestrol–Related Clear–Cell Adenocarcinoma of the Vagina and Cervix*, 316 New Eng.J.Medicine 514 (1987). Anne Needham brought this suit in 1976, and in 1979 won a judgment for $800,000 which this court reversed because of error in the admission of evidence. 639 F.2d 394 (7th Cir.1981). On May 12, 1982, the district court decided that the new trial we had ordered would be limited to liability, and that if Needham won again her damages would be the same $800,000 that she had been awarded at the end of the first trial. She did win again, she was duly awarded $800,000, and the present appeal and cross-appeal followed.

According to White Laboratories, the critical issue in the second trial was whether it should have known back in 1952 that dienestrol might pass through the placenta and induce cancer in the fetus. If so, White Laboratories admits it would be found liable either for negligence, or for the form of strict liability (perhaps misnamed, see *Flaminio v. Honda Motor Co.*, 733 F.2d 463, 466 (7th Cir.1984)) that consists of selling without a warning a product which the seller should know is unreasonably dangerous (see *Woodill v. Parke, Davis & Co.*, 79 Ill.2d 26, 37 Ill.Dec. 304, 402 N.E.2d 194 (1980))—provided that the issue of causation was also resolved in Anne Needham's favor: the Melnick study indicates that clear-cell adenocarcinoma is not always caused by estrogen therapy, so there is some chance that she would have developed the condition even if her mother had never taken dienestrol. On this appeal, however, White Laboratories does not question the sufficiency of the evidence that White should have known of the danger and also that Anne Needham would not have developed adenocarcinoma but for her mother's taking dienestrol.

It had long been known that estrogen treatments could cause cancer in the women receiving the treatments, and that many substances could pass through the placental barrier. A study conducted in 1940 and known to White Laboratories had found abnormalities in the sexual organs of both male and female offspring of rats who had been injected with estrogen during pregnancy. See Greene, Burrill & Ivy, *Experimental Intersexuality: The Effects of Estrogens on the Antenatal Sexual Development of the Rat*, 67 Am.J.Anatomy 305 (1940). But no studies had shown that estrogen would cause cancer in the fetus (contrary to the confident statement in *Bichler v. Eli Lilly & Co.*, 55 N.Y.2d 571, 586, 436 N.E.2d 182, 189 (1982), based on a concession by the defendant in that case); and only one study had found that any cancer could be induced in a fetus by migration of a carcinogen across the placenta, see Larsen, Weed & Rhoads, *Pulmonary–Tumor Induction by Transplacental Exposure to Urethane*, 8 J.Nat'l Cancer Inst. 63 (1947) (urethane, causing lung cancer in offspring of pregnant mice)—let alone the long-delayed estrogen-induced cancer that struck Anne Needham when she was an adult.

■ This may be rather tenuous footing for an inference that before marketing a new drug to pregnant women back in the early 1950s White Laboratories should have conducted tests on pregnant animals (which it did not do) and that if it had done so it would have discovered that estrogen therapy might cause cancer in fetuses, in which event it would surely have had to tell physicians, including Mrs. Needham's physician, to warn their patients of the danger. On the other hand, White Laboratories is almost certainly mistaken in suggesting that the jury would have had to draw this inference in order to impose liability. It would have been quite enough—might indeed have been more than enough, as we shall see later—that White Laboratories should have known that estrogen could cause some harm to the fetus, and immaterial whether the harm took the form of cancer, let alone a specific cancer such as clear-cell adenocarcinoma. *McMahon v. Eli Lilly & Co.*, 774 F.2d 830, 835–36 (7th

Cir.1985) (applying Illinois law in a DES case).

■ At all events, White Laboratories does not question the jury's right to draw an inference of negligence or unreasonable (implying reasonably foreseeable) danger. It does complain about the jury instructions, however, and about the action of the plaintiff's counsel in harping to the jury on the dangers of dienestrol to Anne Needham's mother, even though she was not a plaintiff and, so far as appears, had not been injured by the estrogen treatments that she took while pregnant. The complaints are related; the alleged error in the instructions consists of language that, White Laboratories argues, authorized the jury to award judgment to Anne on the basis of the dangers of dienestrol to her mother.

The attack on the instructions assumes, what is by no means certain but is also unnecessary to decide, that if the harm to Anne Needham was unforeseeable she cannot recover damages merely because the defendant was negligent toward her mother and the negligence caused the daughter's injury. Against the assumption it can be argued that while unforeseeable plaintiffs are sometimes barred (the most famous example being *Palsgraf v. Long Island R.R.*, 248 N.Y. 399, 162 N.E. 99 (1928)), this is by no means always true. In *Renslow v. Mennonite Hospital*, 67 Ill. 2d 348, 10 Ill.Dec. 484, 367 N.E.2d 1250 (1977), a child who had not been conceived at the time the hospital's employees committed negligent acts against her was allowed to recover the harm to herself caused by those acts. The present case is thus an even stronger case for what the Supreme Court of Illinois later described as the "limited area of transferred negligence" (corresponding to transferred intent in the law of intentional torts) recognized in *Renslow*. *Kirk v. Michael Reese Hospital & Medical Center*, 117 Ill.2d 507, 528, 111 Ill.Dec. 944, 954, 513 N.E.2d 387, 397 (1987). See also *Horak v. Biris*, 130 Ill. App.3d 140, 85 Ill.Dec. 599, 474 N.E.2d 13 (1985).

■ Even if the injury to Anne Needham would have had to be foreseeable for White Laboratories to be held liable, its attack on the instructions must fail—and this though the instructions are redundant, disorganized, and full of legal jargon. White Laboratories does not complain about the instructions *en masse;* and although the result of the judge's picking and choosing among the instructions tendered by the parties leaves much to be desired as a specimen of English prose designed for persons with no legal training, we do not set aside a jury verdict on the ground of lack of clarity, or even outright error in some of the instructions, unless—having due regard for the unrealism of assuming that isolated passages in a long set of instructions are likely to have made the difference—we are convinced that the instructions, taken as a whole (see *United States v. Machi*, 811 F.2d 991, 995 (7th Cir.1987)), are likely to have impaired substantially the jury's ability to understand the case. See *W.T. Rogers Co. v. Keene*, 778 F.2d 334, 341–42 (7th Cir.1985); *Wilk v. American Medical Ass'n*, 719 F.2d 207, 218–29 (7th Cir.1983); *Binks Mfg. Co. v. National Presto Industries, Inc.*, 709 F.2d 1109, 1117–18 (7th Cir.1983).

■ White Laboratories focuses on the instruction that allowed the jury to find negligence if "the defendant failed to warn the medical profession ... about the reasonably foreseeable potential development of cancer to users and their offspring exposed to the effects of the drug," or "failed to reasonably test for potential harmful effects to users and their offspring." There was much evidence that White Laboratories should have warned the medical profession about the danger that dienestrol would cause cancer in the *users* of the drug, such as Anne Needham's mother. This evidence was admissible and admitted, even though Mrs. Needham was not a plaintiff, because the more carcinogenic a drug is, the greater the duty of the manufacturer to explore the full scope of its potential danger. This is an application of the basic tort principle (itself a corollary of the even more basic principle that negligence is the failure to take a level of pre-

cautions commensurate with the likelihood and magnitude of the risk created by the defendant's conduct, see, e.g., *McCarty v. Pheasant Run, Inc.*, 826 F.2d 1554, 1556–57 (7th Cir.1987); *Kirk v. Michael Reese Hospital & Medical Center, supra*, 117 Ill.2d at 526, 111 Ill.Dec. at 953, 513 N.E.2d at 396) that the greater the benefits of precaution, the more precautions must be taken. See, e.g., *German v. Illinois Power Co.*, 115 Ill.App.3d 977, 984–85, 71 Ill. Dec. 749, 754–55, 451 N.E.2d 903, 908–09 (1983); *Nelson by Tatum v. Commonwealth Edison Co.*, 124 Ill.App.3d 655, 665, 80 Ill.Dec. 401, 409, 465 N.E.2d 513, 521 (1984); Prosser and Keeton on the Law of Torts 208 (5th ed. 1984). Investigation of the dangers of a product is a form of (or step toward) precaution against those dangers; so the greater the potential dangers, the greater the duty of inquiry. In the case of a drug given to pregnant women, the potential danger includes harm to the fetus, since many substances pass the placental barrier—and this was known in 1952. But because no one in 1952 knew that estrogen therapy could cause cancer in the fetus, the plaintiff's counsel naturally placed heavy emphasis on the studies that showed it might cause cancer in the mother, as those studies helped bridge the gap between the single study that had shown that estrogen might harm the fetus and the conclusion he wanted the jury to draw (perhaps unnecessarily) that White Laboratories should have realized there was a risk that estrogen might cause cancer in the fetus. White Laboratories argues that this heavy emphasis, combined with the instruction quoted above, invited the jury to award Anne Needham damages for White Laboratories' failure to warn the medical profession about the danger of dienestrol to the user, not the danger to the fetus.

This argument (an artifact of White Laboratories' own insistence that Anne Needham prove that the danger of *cancer* to the fetus must be foreseeable, but we shall pass this point by for the moment) is not rebutted by pointing out that the phrase "users *and* their offspring" (emphasis added) logically required the jury to find that the potential for the development of cancer in offspring as well as users was reasonably foreseeable. That is pushing logic too hard, since "and" is frequently used disjunctively (as one when says, "I don't have any aches and pains" today). Nevertheless, White Laboratories' argument must fail. Shortly after the quoted passage, the instructions tell the jury: "It was the duty of the defendant, before and at the time of Mary Needham's ingestion of dienestrol, to use ordinary care for the safety of the plaintiff." The only plaintiff was Anne Needham. Later the judge said, "If you [the jury] find that the defendant White Laboratories knew or should have known by way of proper testing or inquiry into the scientific literature that the drug dienestrol was capable of causing harm to Anne Needham, and that the defendant White Laboratories did not convey this information to the medical profession, those facts would constitute negligence." This is the clearest passage in the instructions, and it should have dispelled the ambiguity created by the "users and their offspring" passages. The instructions on strict liability are explicitly limited to danger to offspring, and White Laboratories does not complain about them.

No doubt the plaintiff's counsel was trying to strengthen his case that the defendant should have investigated and discovered the danger to the fetus, by directing the jury's attention to dramatic evidence that the defendant had been distressingly insouciant about the danger that dienestrol would cause cancer in the user of the drug, i.e., the mother. Unless the district judge was prepared to rule that foreseeability of the danger to the mother was enough, which he was not prepared to do, it would have been better if he had made clear to the jury that this evidence was relevant only insofar as it showed that a responsible firm would have conducted tests on pregnant animals before making the drug available to human beings, or at least would have warned the medical profession about the danger so that doctors could advise their patients on the tradeoffs between, on the one hand, the destruction of the fetus by miscarriage and, on the other, the dan-

ger of cancer to the mother and the possible danger of cancer or other illness or deformity to the fetus. But the instructions read as a whole put the issue correctly to the jury, if less clearly than could be desired. And copies of the instructions were given the jury to take with them into the jury room; they were not forced to rely on their memories.

■ We do not pretend to know a great deal about the mental processes of jurors. Since jurors are not required to explain their reasoning, since their deliberations are confidential, and since their lack of legal training and experience makes it difficult for a judge to think his way into their minds, the attempt by judges to evaluate the impact of specific instructions on a jury's verdict is speculative and quite likely to be mistaken. This is a reason to proceed cautiously when asked to set aside a jury's verdict, and order a new trial bound to consume substantial judicial resources, on the ground that the instructions contained erroneous or confusing passages. This cautious approach is especially appropriate for an appellate court asked to set aside the verdict of a jury that, necessarily, it never saw. The instructions here were inelegant and somewhat ambiguous, but that is not a good enough reason to put the parties and the district court through the ordeal of another trial.

■ White Laboratories' second ground of appeal—that Needham's lawyer was allowed to make too much of the evidence of the danger to users of the drug, both in his opening and closing statements and in his questions to witnesses—requires little discussion. The balancing of the probative value of relevant evidence against its inflammatory or otherwise prejudicial or confusing effect (see Fed.R.Evid. 403) is a matter committed to the judgment and good sense of the district judge, and we will rarely try to second-guess the balance struck. Certainly not here, for White Laboratories must shoulder a substantial share of the blame for what it contends was an excessive harping on the undoubted danger of its drug to the users. Its lawyer failed to object to most of this evidence, and,

when he did object, failed to state the ground of the objection clearly. Had he done so, Judge Kocoras might have curtailed the scope of the inquiry and refocused the trial.

■ We move to the cross-appeal, where the plaintiff is asking for a new trial on the ground that if $800,000 was a correct assessment of her damages in 1979 (which no one questions), it *must* be too little today. Stressing the considerable inflation that has occurred since then, she submitted an affidavit to the district court showing that an award of at least $1,212,-000 in November 1986 (shortly before the second trial) would be necessary to confer the same purchasing power that $800,000 had conferred in 1979. The inflation may have been anticipated and provided for in the earlier award, but that would not affect the argument; that award was premised on the assumption that she would receive the award at once and invest it in order to earn interest that would offset (in part anyway) the inflation. Even without any inflation, the same award seven years later would probably be too little. An award of tort damages compensates not only for future losses but also for past losses up to the date of trial. If a judgment is delayed by seven years, the plaintiff will be entitled to seven more years of past losses and seven fewer years of future losses, and since future losses are discounted to present value they will be weighted less heavily in the award. However, courts do not discount future losses due to disfigurement or pain and suffering, as distinct from loss of earnings and medical expenses, see, e.g., *Fenolio v. Smith*, 802 F.2d 256, 258 (7th Cir. 1986); *Exchange Nat'l Bank v. Air Illinois, Inc.*, 167 Ill.App.3d 1081, 118 Ill.Dec. 691, 522 N.E.2d 146, (1988); Dobbs, Handbook on the Law of Remedies 574 (1973), and it is likely that most of Anne Needham's damages are of the former sort, although the award may include some allowance for future medical expense.

Although the plaintiff's argument that the damages award is too low might have been a powerful one if the issue of damages had been litigated in the second trial

and if the jury had decided that since a previous jury had awarded $800,000 in 1979 it should award the same amount notwithstanding the decline in the purchasing power of the dollar or the possible asymmetry of past and future losses, there was no second trial on damages. The plaintiff could of course challenge the second judgment on the ground that the district court's order in May 1982 determining that there would be no second trial on damages was erroneous, but she makes no complaint in this court about that order and she has therefore waived any objection to the amount of the damages.

 The last issue is whether the plaintiff is entitled to prejudgment interest. The plaintiff tries to convert the issue into one of postjudgment interest, citing the Illinois postjudgment interest statute, Ill. Rev.Stat. ch. 110, ¶ 2–1303. In fact, as we noted recently, postjudgment interest in federal diversity cases is governed by federal rather than state law. See 28 U.S.C. § 1961(a); *Travelers Ins. Co. v. Transport Ins. Co.*, 846 F.2d 1048, 1053–54 (7th Cir.1988). But as neither party has cited the federal postjudgment interest statute, any argument based on it is waived—and in any event Needham would not be entitled to postjudgment interest under cases interpreting the Illinois statute. She points out that a judgment for $800,000 in damages was entered in 1979 and that the effect of the district court's second judgment was to reinstate the original one, and concludes that she is entitled to interest at the statutory rate since 1979. Although Illinois courts award postjudgment interest from the date of a judgment that was reinstated after having been set aside by the trial judge or reversed by an intermediate appellate court, see, e.g., *Proctor Community Hospital v. Industrial Comm'n*, 50 Ill.2d 7, 276 N.E.2d 342 (1971); *Wirth v. Industrial Comm'n*, 63 Ill.2d 237, 347 N.E.2d 136 (1976), that is not what happened here. The 1979 judgment was never reinstated. It was set aside, the case was retried, and a new judgment was entered, albeit one identical in amount to the old judgment.

██ But this leaves the question, also raised by the plaintiff, whether *pre*judgment interest might be awarded. Originally, prejudgment interest was awarded only in suits for a sum certain, for example a suit to collect a promissory note. Whether from a sharper awareness (perhaps inflation-induced) that prejudgment interest is necessary to compensate plaintiffs fully and discourage defendants from stalling, or whether from increased sympathy for plaintiffs, or for both or other reasons, courts in Illinois and elsewhere have become more liberal in their allowance of prejudgment interest and will nowadays award it in contract cases whenever the defendant's liability can be readily computed, so that it can protect itself from having to pay interest by tendering the amount of its liability to the court, to be returned to it of course if it wins the case. See our recent discussion in *Empire Gas Corp. v. American Bakeries Co.*, 840 F.2d 1333, 1342 (7th Cir.1988) (applying Illinois law).

Ordinarily in a tort suit the amount of the defendant's liability cannot be computed with the required precision until judgment is entered, so there is no question of awarding prejudgment interest. This was the situation here until May 12, 1982, when the district court decided that if the plaintiff won the second trial she would receive the same amount of damages—$800,000—that the first jury had awarded. On that day it became certain—as certain as if this had been a suit on a promissory note for $800,000—that White Laboratories, if it lost again, would owe Needham $800,000. It could have deposited that amount in the district court with complete certainty that this was what it would owe the plaintiff if she won.

This reasoning would be decisive if prejudgment interest in Illinois were a matter of common law; for we would predict that, faced by a case such as this, the courts of Illinois would consider the award of prejudgment interest to be entirely reasonable. In some states issues of prejudgment interest are common law issues. See, e.g., *Afram Export Corp. v. Metallurgiki Halyps, S.A.*, 772 F.2d 1358, 1370–71 (7th

Cir.1985) (applying Wisconsin law). Unfortunately for Anne Needham, the award of prejudgment interest in Illinois is governed by a statute that awards such interest only on "all moneys after they become due on any ... instrument of writing," on loans, on money due on the settlement of accounts, on money "received to the use of another and retained without the owner's knowledge," and on "money withheld by an unreasonable and vexatious delay of payment." Ill.Rev.Stat. ch. 17, ¶ 6402. None of these conditions could possibly be satisfied by Needham's products liability suit against the manufacturer of the drug ingested by her mother, unless White Laboratories' refusal to pay up after losing the first time could be considered fraudulent, cf. *Singer Co. v. Skil Corp.*, 803 F.2d 336, 340–41 (7th Cir.1986), or otherwise unreasonable and vexatious, which it could not be; White Laboratories had a valid ground for believing that judgment to be invalid. Cf. *Shulz v. Rockwell Mfg. Co.*, 108 Ill. App.3d 113, 122–23, 63 Ill.Dec. 867, 876–77, 438 N.E.2d 1230, 1236 (1982); *Trotter v. Moore*, 113 Ill.App.3d 1011, 1017–18, 69 Ill.Dec. 653, 658, 447 N.E.2d 1340, 1345 (1983), rev'd on other grounds, 101 Ill.2d 551, 82 Ill.Dec. 456, 468 N.E.2d 1236 (1984).

The only Illinois case that Needham cites on prejudgment interest is a contract case, *Emmenegger Construction Co. v. King*, 103 Ill.App.3d 423, 59 Ill.Dec. 237, 431 N.E. 2d 738 (1982). She cites no authority for the proposition that Illinois courts would recognize a common law right to prejudgment interest in cases not covered by the statute; our decision in *In re Air Crash Disaster Near Chicago*, 644 F.2d 633, 638 (7th Cir.1981) (applying Illinois law), is some evidence they would not. Our own research has discovered several cases in which Illinois courts have asserted a power to award prejudgment interest on equitable rather than statutory grounds, but the power is asserted hesitantly, and there is no indication that it could reach as far as the present case. *Alguire v. Walker*, 154 Ill.App.3d 438, 448, 107 Ill.Dec. 279, 286–87, 506 N.E.2d 1334, 1341–42 (1987), mentioned the power but refused to invoke it, holding that just because the defendant had had the use of what was ultimately determined to be the plaintiff's money for the three years while the lawsuit was pending he was not entitled to prejudgment interest; otherwise every winning plaintiff would be. *Richman v. Chicago Bears Football Club, Inc.*, 127 Ill.App.3d 75, 82 Ill.Dec. 225, 468 N.E.2d 487 (1984), refused to award prejudgment interest on equitable grounds but referred to several cases that had done so. None of these cases is pertinent: *Shell Oil Co. v. Department of Revenue*, 95 Ill.2d 541, 70 Ill.Dec. 191, 449 N.E.2d 65 (1983), involved a claim by taxpayers for interest actually earned by the State Treasurer on money unlawfully collected from them, while *City of Springfield v. Allphin*, 82 Ill.2d 571, 45 Ill.Dec. 916, 413 N.E.2d 394 (1980), a similar case, actually disavowed any broad equitable power to award prejudgment interest, see *id.* at 579, 45 Ill.Dec. at 920, 413 N.E.2d at 398. Finally, *Steward v. Yoder*, 86 Ill.App.3d 223, 226, 41 Ill.Dec. 709, 711, 408 N.E.2d 55, 57 (1980), holds that there can be no equitable award of prejudgment interest in the absence of proof of "bad conduct." (This was repeated in *Richman*, see 127 Ill.App.3d at 78, 82 Ill.Dec. at 228, 468 N.E.2d at 490.) There was none in this case beyond the conduct giving rise to the suit; if *that* "bad conduct" were enough, every successful tort plaintiff would recover prejudgment interest.

Although the rationale for prejudgment interest is applicable to this case, we are given no grounds for believing that the Illinois courts would embrace it in the face of a narrowly drawn and detailed statute apparently governing the matter, and an excruciatingly small judge-made "equitable" safety valve which has never been opened in a case remotely similar to this case. We hesitate to undertake creative forays in matters of state law—especially when not urged to do so. For Needham does not argue that Illinois courts might recognize a duty apart from the statute; she fails to cite the statute, let alone discuss its limitations.

Affirmed.

BAUER, Chief Judge, dissenting.

Regrettably, I must dissent from the majority's disposition of this case.

## I.

This is a failure-to-warn case. In our earlier opinion remanding for a new trial seven years ago, we framed the dispositive issue as "whether White should be held liable for its failure to warn of the risk of cancer to the *offspring* of pregnant women who used dienestrol." *Needham v. White Laboratories, Inc.*, 639 F.2d 394, 402 (7th Cir.1981) (emphasis added). We based this formulation on *Woodill v. Parke Davis & Co.*, 79 Ill.2d 26, 37 Ill.Dec. 304, 402 N.E.2d 194 (1980), in which the Illinois Supreme Court held that a drug manufacturer is strictly liable for failing to warn of an inherent product danger only if the manufacturer had knowledge, or by the application of reasonable, developed human skill and foresight, should have had knowledge of the danger. *Id.* at 35, 37 Ill.Dec. at 310, 402 N.E.2d at 200. Thus, under Illinois law, a drug manufacturer's duty to warn in a "strict" products liability case is analogous to its duty in a products liability case based on negligence—it must warn if it knows or has reason to know of the product's danger. *See* Restatement (Second) of Torts § 388 (1965); *Dougherty v. Hooker Chemical Corp.*, 540 F.2d 174, 177–78 (3d Cir.1976); *Martinez v. Dixie Carriers, Inc.*, 529 F.2d 457, 464–65 (5th Cir.1976). Anne Needham pursued both liability theories against White Laboratories.

As the majority points out, it was well known by 1952 that estrogen treatments could cause cancer in women receiving the treatment, and that many substances could pass through the placental barrier. But, as the majority also admits, it was not clear whether estrogen therapy could cause cancer in the fetuses of pregnant women receiving the treatment. Thus, White Laboratories had a duty in 1952 to warn Mary Needham, Anne's mother, of the dangers of dienestrol *to her* and was negligent in not doing so. On the other hand, whether White Laboratories had a duty to test for and warn Mary Needham of danger of

dienestrol to *Anne*, with whom Mary Needham was pregnant when she ingested the drug, and whether it was negligent in not doing so, is much less clear. Mary Needham was not injured by the treatments, however, and is not a plaintiff in this action. Anne Needham was injured, and is the plaintiff here.

Which brings us to the district court's negligence instruction, which stated:

The plaintiff, Anne Needham, claims in Count 1, the claim of negligence, that she was injured and that the defendant was negligent in one or more of the following respects:

One: That the defendant failed to reasonably test for potential harmful effects to *users* and their offspring;

Two: That the defendant failed to warn the medical profession, and, specifically, Dr. Abrams, about the reasonably foreseeable potential development of cancer to *users* and their offspring exposed to the effects of its drug, dienestrol.

The plaintiff further claims that one or both of the foregoing was a proximate cause of her injury.

(Emphasis added.) The Court went on to instruct:

The plaintiff has the burden of proving each of the following propositions as to Count 1, the claim of negligence:

First, that the dienestrol ingested by plaintiff's mother was a proximate cause of plaintiff's cancer;

Second, that the defendant acted or failed to act in *one* of the ways claimed by the plaintiff as stated to you in these instructions and that in so acting or failing to act, the defendant was negligent;

Third, that the negligence of the defendant was a proximate cause of the injury to the plaintiff.

If you find from your considerations of all of the evidence that each of these propositions has been proved, then your verdict should be for the plaintiff.

(Emphasis added.) As the italicized portions of this instruction indicate, the district court apparently did not read our earlier opinion too carefully. The problem is

obvious. The court's language allowing a finding of negligence if "the defendant failed to reasonably test for harmful effects to *users* and their offspring" or "failed to warn the medical profession ... about the reasonably foreseeable potential development of cancer to *users* and their offspring" authorized the jury to award Anne Needham damages on the basis of White's negligence toward her mother. And because the jury did not return a special verdict, we will never know if it did so.

The majority tries, unconvincingly, I think, to explain this defect away. Even though the instructions left "much to be desired as a specimen of English prose designed for persons with no legal training," the majority holds that the instructions "read as a whole put the issue correctly to the jury, if less clearly than could be desired." First, says the majority, the court later in the instructions stated that "[i]t was the duty of the defendant, before and at the time of Mary Needham's ingestion of dienestrol, to use ordinary care for the safety of the plaintiff." (The only plaintiff, the majority points out, is Anne Needham.) But this hardly corrects the problem. The district court's language still allowed the jury to conclude that White failed to use "ordinary care for the safety of the plaintiff" if it failed to warn Mary Needham of the dangers of dienestrol to her, the *user*, rather than to *Anne*, the plaintiff. Second, says the majority, the court, also later in the instruction, stated that "[i]f you [the jury] find that the defendant White Laboratories knew or should have known by way of proper testing or inquiry into the scientific literature that the drug dienestrol was capable of causing harm to Anne Needham, and that the defendant White Laboratories did not convey this information to the medical profession, those facts would constitute negligence." But this statement still leaves the jury free to conclude that White was negligent if it failed to warn Mary Needham about dienestrol's danger to her as the drug's user— it does not state that these are the only facts upon which the jury could find White liable. Finally, because "copies of the in-

structions were given to the jury to take with them into the jury room" and jury members, therefore, "were not forced to rely on their memories," the majority finds the negligence charge less problematic. This mystifies me. That the jury took the instructions with them to the jury room means only that its members did not have to remember the court's instructions to be confused, they could read them and be confused.

That a jury instruction contains errors, of course, does not by itself dictate reversal. *W.T. Rogers Co., Inc. v. Keene,* 778 F.2d 334, 341–42 (7th Cir.1985). I also am aware that it can be "artificial" to assume that "isolated passages in a lengthy set of instructions are apt to spell the difference between victory and defeat." *Id.* at 342. But I cannot agree with the majority that the district court's negligence instruction, taken as a whole, did not impair substantially the jury's ability to understand the case. As explained above, the erroneous passages never truly were corrected. Moreover, the abundance of evidence admitted during the trial of dienestrol's harmful effect on women receiving it, and the heavy emphasis placed upon that evidence by plaintiff's counsel, magnifies many times the errors in the instructions and, for me, tips the scale in favor of reversal. As the majority points out, the district court never made clear to the jury that evidence of dienestrol's harmful effects on the user of the drug had limited relevance.

For these reasons, there is more than a substantial possibility that the jury understood this case to turn on whether White Laboratories knew or should have known of the harmful effects Mary Needham might have suffered from ingesting dienestrol, and if it did know or should have known of such danger, whether it adequately warned Mary Needham. Because of this, I cannot affirm the judgment below.

## II.

But I cannot stop here. In reaching its conclusion that the negligence charge, although confusing, did not warrant reversal,

the majority casts doubt on two other aspects of White's claim. Although the majority found it unnecessary to delve deeper into either matter because of its views on the negligence charge, my belief that the negligence instruction warrants reversal compels me to address them.

First, the majority states that White is "almost certainly mistaken" in suggesting that the jury had to find that White knew or should have known that estrogen could cause *cancer* in the offspring of the user. According to the majority, under *McMahon v. Eli Lilly & Co.*, 774 F.2d 830, 835–36 (7th Cir.1985), "[i]t would have been quite enough—might indeed have been more than enough—that White Laboratories should have known that estrogen could cause some harm to the fetus, and immaterial whether the harm took the form of cancer, let alone a specific cancer such as clear-cell adenocarcinoma." This statement is not altogether true, however; nor does it undermine White's attack on the negligence instruction.

In *McMahon*, the plaintiff alleged that her prenatal exposure to DES (when her mother ingested the drug while pregnant with her) manufactured by the defendant had rendered it difficult for her to achieve full-term pregnancies and normal deliveries. The district court directed a verdict for the defendant, however, holding that she had failed to prove that the defendant "knew or should have known of a risk of pre-term labor or prematurity among children of those women who in 1955 had ingested DES during pregnancy." *Id.* at 835. We reversed, holding that, under Illinois law, the plaintiff did not have to prove that the defendant manufacturer should have anticipated the precise injuries she allegedly suffered, so long as the injuries lay within the scope of the known dangerous propensities of DES. *Id.* (citing *Ferebee v. Chevron Chemical Co.*, 736 F.2d 1529, 1537 (D.C.Cir.), *cert. denied*, 469 U.S. 1062, 105 S.Ct. 545, 83 L.Ed.2d 432 (1984)). We concluded that "[t]here was sufficient evidence from which a jury could reasonably have found that in 1955 Lilly knew or should have known that DES might cause reproductive abnormalities, such as prema-

turity, in the female offspring of women exposed to DES." *Id.* at 836.

The majority is thus correct in pointing out that, to impose liability under Illinois law, the jury did not have to find that White knew or should have known that dienestrol could cause clear-cell adenocarcinoma, or perhaps even some form of cancer, in the female offspring of women exposed to dienestrol. But it is incorrect to state flatly that the jury could impose liability if it found that White Laboratories should have known that estrogen could cause "some harm to the fetus." That "some harm" still would have to fall within the scope of the "known dangerous propensities of dienestrol." *McMahon*, 774 F.2d at 835. In other words, the harm must be reasonably foreseeable.

In any case, even if the majority is correct in its belief that the district court framed the question of foreseeability too narrowly in its negligence charge, White's central contention on appeal remains intact. White does not complain that the negligence charge allowed the jury to find liability on the ground that it knew or should have known of an arguably unforeseeable harm to *Anne* Needham. Rather, White complains that the jury was authorized by the district court to find liability based upon White's knowledge of potential harm to *Mary* Needham. Thus, White's attack on the negligence charge can hardly be an "artifact" of its "own insistence that Anne Needham prove that the danger of *cancer* to the fetus must be foreseeable." (Majority's emphasis.) For even if White conceded that the jury could award damages to Anne Needham if it found that White knew or should have known of some foreseeable harm to Anne other than cancer, and that it failed to warn of such harm, White's argument would remain: there still is a substantial possibility that the jury awarded Anne Needham damages on the basis of the company's negligence toward her mother.

The majority next hints that the injury to Anne Needham may not have to be foreseeable *at all* to impose liability on White. According to the majority, White's "attack

on the instructions assumes what is by no means certain ... that if the harm to Anne Needham was unforeseeable she cannot recover damages merely because the defendant was negligent toward her mother and the negligence caused the daughter's injury." "While unforeseeable plaintiffs are sometimes barred," the majority continues (perhaps understating things), the present case is a strong one for the " 'limited area of transferred negligence' " recognized by the Illinois Supreme Court in *Renslow v. Mennonite Hospital,* 67 Ill.2d 348, 10 Ill. Dec. 484, 367 N.E.2d 1250 (1977). This is quite a statement, and if it is correct, White's attack on the district court's negligence charge is indeed wiped out.

In *Renslow,* the plaintiff alleged that the defendants, a doctor and a hospital, had negligently transfused her mother, who at the time was 13 years old, with 500 cubic centimeters of RH-positive blood, which sensitized her mother's incompatible RH-negative blood. Years later, the sensitization of her mother's blood allegedly caused prenatal damage to plaintiff's hemolitic processes, which put plaintiff's life in jeopardy and necessitated her induced premature birth. Plaintiff was born jaundiced and suffering from hyperbilirubinemia, required two complete blood transfusions shortly after her birth, and alleged that, as a result of the defendants' negligent acts, she suffered permanent damage to various organs, her brain, and her nervous system. The issue in *Renslow:* whether the plaintiff, "not yet conceived at the time negligent acts were committed against [her] mother, [has] a cause of action against the tortfeasors for [her] injuries resulting from their conduct[.]" *See id.,* 10 Ill.Dec. at 485, 367 N.E.2d at 1251. The trial court held that she did not and dismissed her cause of action. *Id.* On appeal, the Illinois Supreme Court reversed.

In reaching its decision, the Illinois Supreme Court first rejected "the rule permitting a cause of action only where the plaintiff was viable at the time of the injury." *Id.* 10 Ill.Dec. at 486–87, 367 N.E.2d at 1252–53. Next, the court considered, and rejected, the defendants' assertion that they nevertheless owed no duty to plaintiff

because her injuries were not reasonably foreseeable at the time of their negligent act. *Id.* 10 Ill.Dec. at 487, 367 N.E.2d at 1253. According to the court,

> [i]t [had] long been known that sensitization occurs in 90% of Rh-negative women who have received multiple transfusions of Rh-positive blood, and that about 85% of white Americans and a higher percentage of American Negroes and Chinese are Rh-positive. It [had] been likewise long known that the Rh-positive fetus of an Rh-negative woman previously sensitized is "at high risk." Thus it [had] been pointed out that "it must be an absolute rule that Rh-positive blood is never transfused to an Rh-negative female who is below the age of menopause. For these reasons, routine Rh typing [had] been established since at least 1961.

*Id.* (citations omitted). Based upon this information, the court "could not conclude that the harm caused plaintiff was not reasonably foreseeable." *Id.*

But even this did not solve completely the question whether the plaintiff had a cause of action. Foreseeability and duty, said the supreme court, are not identical in scope. *Id.* Although the court had held previously that *no legal duty arises unless harm is reasonably foreseeable, id.* (referring to *Cunis v. Brennan,* 56 Ill.2d 372, 56 Ill.Dec. 372, 308 N.E.2d 617 (1974)) (emphasis added), in some instances, no duty arises even though harm is foreseeable, *id.,* 10 Ill.Dec. at 487–88, 367 N.E.2d at 1253–54, because "policy lines, to some extent arbitrary, must be drawn to narrow an area of actionable causation." *Id.* 10 Ill.Dec at 488, 367 N.E.2d at 1254. The court pointed out, for instance, that negligence historically could not be founded upon the breach of duty owed to some person other than the plaintiff, *id.* 10 Ill. Dec. at 488, 367 N.E.2d at 1254 (citing Prosser, Torts, § 53 at 325 (4th ed. 1971)), and that a duty could be owed only to one with a legally identifiable existence, *id.* (citing Pollock, Torts, at 361 (14th ed. 1939) ("[N]egligence in the air, so to speak, will not do.")). But, as the court also pointed out, "duty is not a static concept," *id.;* it can change just as policy can change. For

example, the court noted that it had "long recognized that a duty may exist to one *foreseeably* harmed even though he be unknown and remote in time and place," *id.,* 10 Ill.Dec. at 489, 367 N.E.2d at 1255 (emphasis added), and that "derivative actions, such as those of a husband or parent for the loss of a wife's or child's services, demonstrate that the law has long recognized that a wrong done to one person may invade the protected rights of one who is intimately related to the first." *Id.* The plaintiff in *Renslow,* as the court put it, was asking the court to reexamine its notions of duty yet again and to find, in essence, "a contingent prospective duty to a child not yet conceived but *foreseeably* harmed by a breach of duty to the child's mother." *Id.* (emphasis added). And the court did exactly that. After concluding that "cases allowing relief to an infant for injuries incurred in its previable state make it clear that a defendant may be held liable to a person whose existence was not apparent at the time of his act," *id.,* 10 Ill.Dec. at 489, 367 N.E.2d at 1255, the court found it "illogical to bar relief for an act done prior to conception where the defendant would be liable for this same conduct had the child, unbeknownst to him, been conceived prior to his act." *Id.*

According to the majority, Anne Needham's claim is an even stronger case for "transferred negligence" than the *Renslow* plaintiff's claim, presumably because Anne Needham was conceived at the time White Laboratories was negligent toward her mother. But the whole point of *Renslow* is that, if the harm to the plaintiff was reasonably foreseeable, it should not matter whether the plaintiff was conceived when the defendant's negligent act occurred. The key to the court's holding in *Renslow* was not the "intimate relationship" between the plaintiff therein and her mother, it was the court's finding that the harm suffered by the plaintiff was reasonably foreseeable. Indeed, at every step of its analysis, the court noted the foreseeability of the plaintiff's harm. In short, the court in *Renslow* did not "transfer" any negligence on the part of the defendant toward the plaintiff's mother from the mother to the plaintiff. To the contrary, the court in *Renslow* held that a duty ran to the plaintiff herself.[1]

*Renslow,* therefore, is not a "transferred negligence" case. Although the court noted that "the law recognizes a limited area of transferred negligence" in "derivative actions such as those of a husband or parent for the loss of the wife's or child's services," the court did not ground its holding on the "transferred negligence" theory. It merely touched upon transferred negligence during its discussion of "duty" as a reflection of policy considerations, which in Illinois place great weight upon reasonable foreseeability. Moreover, because the type of derivative actions to which the court was referring in *Renslow* involve situations where the injury suffered by the "derivative" plaintiff is reasonably foreseeable, "transferred negligence," at least as recognized by Illinois courts, seems to incorporate a reasonable foreseeability requirement. Finally, Anne Needham's claim is

---

1. Admittedly, the Illinois Supreme Court's opinion in *Kirk v. Michael Reese Hospital and Medical Center,* 117 Ill.2d 507, 111 Ill.Dec. 944, 513 N.E.2d 387 (1987), does seem to read *Renslow* differently. In *Kirk,* the court stated that "[t]he duty in *Renslow* was based primarily on the injury's being a direct result of alleged negligence to the infant's mother, which was found to have invaded the protected rights of the child, who was intimately related to the mother." *Id.,* 111 Ill.Dec. at 954, 513 N.E.2d at 397. The court in *Kirk,* however, did not use the "transferred negligence" doctrine, because no intimate relationship existed between the patient, who received negligent care from the defendant hospital, and the plaintiff, who was later injured while a passenger in plaintiff's car. *Id.*

As my discussion above indicates, I disagree with the *Kirk* court's construction of *Renslow.* Indeed, the court in *Kirk* used the absence of the intimate relationship between the patient and his car passenger to bar recovery for an injury that *was* foreseeable suffered by a plaintiff who *was* foreseeable. This seems to me an anomalous result. In any case, *Kirk,* at best, stands for the proposition that if no intimate relationship exists, there can be no transferred negligence. It does not support the proposition for which the majority would have to use it— that the presence of an intimate relationship between Anne and Mary Needham justifies "transferred negligence," even where Anne's injury was not foreseeable. *Kirk* says nothing about foreseeability; *Renslow* does.

not even analogous to a derivative action by a spouse or parent for the loss of the other spouse's consortium or a child's services or, for that matter, by a child for the loss of a parent's services. In such cases, the injury to the derivative plaintiff follows from an injury to the direct (more direct than the derivative plaintiff, at least) victim of the defendant's negligence. But Anne Needham does not claim an injury that derives from an injury to her mother. As noted earlier, her mother was not injured. *Renslow*, then, hardly wipes out White's attack on the district court's negligence charge. In my view, it bolsters White's contention that the jury still had to find that the harm to *Anne* Needham was reasonably foreseeable before it could impose liability for negligence.

For these reasons, I dissent. The case should be reversed and remanded for a new trial. As it stands now, after almost a decade of litigation, the parties fulfilled their part of the bargain, but the federal courts never quite got it right.