MYRA STENNIS, as Mother and Next Friend of Marcus Stennis, a Minor, Plaintiff-Appellee, v. CHRIS REKKAS, Defendant-Appellant.

First District (1st Division)   No. 1—90—0471

Opinion filed July 27, 1992.—Rehearing denied October 2, 1992.

Wildman, Harrold, Allen & Dixon, of Chicago (Ruth E. VanDemark, Ellen Keefe-Garner, Mary Elisabeth Ruether, and John M. Stalmack, of counsel), for appellant.

John G. Phillips & Associates, of Chicago (John F. Klebra and J.W. Mitchell, of counsel), for appellee.

JUSTICE CAMPBELL delivered the opinion of the court:

Plaintiff Myra Stennis, as mother and next friend of minor Marcus Stennis, brought suit in the circuit court of Cook County against defendant Chris Rekkas, M.D., for injuries Marcus sustained during his birth. Following a jury trial, a verdict was rendered in favor of plaintiff; defendant now appeals. For the reasons which follow, we affirm.

The record on appeal contains the following facts. On December 29, 1979, plaintiff filed a medical malpractice action against defendant, arising out of treatment provided to Myra and Marcus on September 8, 1976. The initial complaint alleged that as a result of Dr. Rekkas' acts or omissions, Marcus suffers from a permanent paralysis in his right arm. The complaint was later amended to include a count alleging *res ipsa loquitur*. Dr. Rekkas denied all of the above allegations.

During the course of pretrial discovery, Dr. Rekkas requested the names and opinions of any experts plaintiff intended to call as witnesses at trial. Plaintiff eventually identified Dr. Allan Charles as her liability expert.

Dr. Charles was deposed on September 16, 1983. At his deposition, Dr. Charles testified that he was an obstetrician and gynecologist and that the medical background provided to the defense in his curriculum vitae was current. Dr. Charles testified that in connection to this lawsuit, he had reviewed delivery records from Saint Mary of Nazareth Hospital, nursery records, records from Children's Memorial Hospital and Dr. Rekkas' deposition transcript. He had also reviewed certain texts and articles in forming his opinions about the case. He had not relied on verbal information outside these records, including information provided by plaintiff's counsel.

Dr. Charles opined that Dr. Rekkas had deviated from the standard of care in delivering Marcus because the records he reviewed indicated that Marcus had a permanent brachial plexus injury. Dr. Charles explained that the injury indicated lack of the proper maneuvers for delivery of a "tight shoulder." Dr. Charles identified two maneuvers which could be performed in such a case. The first maneuver, according to Dr. Charles, was the "tight ring," in which the child's position is rotated—similar to a corkscrew effect—to move the child's shoulders into a position conducive to delivery. The second maneuver would

be to reach into the mother's vagina and sweep the child's posterior arm across the child's chest, thereby reducing the diameter of the shoulder girdle.

Dr. Charles also opined that Marcus had a fractured humerus as well as the extensive brachial plexus injury, and that these injuries indicated that excessive force was applied during the delivery of the shoulders. Dr. Charles indicated that he had no other opinions relating to a deviation from the standard of care in this case.

Following a motion for partial summary judgment, the case was allowed to proceed to trial on the theories of: (1) failure to perform proper maneuvers; (2) exertion of excessive force during delivery; and (3) *res ipsa loquitur*. The trial court also considered a number of motions *in limine*. The trial court ruled that Dr. Rekkas could have an order barring criticism of the use of fundal pressure during delivery. The trial court denied Dr. Rekkas' motion *in limine* to bar testimony concerning the fact that Marcus bit his nails, accepting plaintiff's argument that the fact that Marcus did so until he bled showed the loss of feeling in Marcus' fingers. The trial court granted Dr. Rekkas' motion to bar testimony that Marcus suffered brain damage or cognitive difficulties as a result of the delivery, for there was no expert testimony on the subject.

The case proceeded to trial on September 28, 1989. Myra Stennis testified that while pregnant with Marcus, she noticed labor pains and contractions in the early morning hours of September 8, 1976. She called Dr. Rekkas at about 8:30 or 9 a.m. Dr. Rekkas advised her to stay home and call him when the contractions were five minutes apart. Myra testified that the contractions were five minutes apart at about 6 p.m. that evening.

Myra and her husband arrived at the hospital at about 7:40 p.m. that evening. Myra was taken to the delivery room and prepared for the delivery. Dr. Rekkas arrived at about 8:10 p.m. About 5 or 10 minutes later, Dr. Rekkas stated that he could see the child's hair. Dr. Rekkas told Myra to push and told two nurses to push down on Myra's stomach. Marcus was delivered; Myra testified that she could not see what Dr. Rekkas did during the delivery due to a sheet placed over her legs.

The next morning, a nurse brought Marcus to Myra for a feeding. After unwrapping Marcus, Myra noticed that his right eye was partially closed and his right arm was lying by his side. Myra asked the nurse what was wrong with Marcus' arm; the nurse said that she did not know and referred Myra to the doctor.

Myra testified that she saw Dr. Rekkas later that same morning and asked him about the problem with Marcus' arm. When Myra was asked what Dr. Rekkas said, Myra did not complete an answer, and a short recess was called at the request of plaintiff's attorney. Outside the hearing of the jury, the trial judge asked Myra if she would try not to cry on the stand. The trial judge acknowledged that this must be difficult for Myra and stated that he did not like to tell a witness how to act on the stand because credibility is an issue in every case. However, the trial judge opined that the appellate court sometimes held that a weeping witness may unduly influence a jury and grant a retrial. Myra indicated that she would try not to cry again.

Continuing her testimony before the jury, Myra stated that Dr. Rekkas told her that it was a hard delivery and that he had to pull on Marcus to get him out. Dr. Rekkas recommended to Myra that she take Marcus to a pediatrician after she was discharged from the hospital. Myra took Marcus to a pediatrician the day after her discharge. The pediatrician advised Myra to take Marcus to Children's Memorial Hospital. Myra stated that she has taken Marcus to a number of doctors, therapists and hospitals over the years. Myra testified that Marcus has a condition called Klumpke's paralysis and that the condition of his arm has remained basically the same since birth.

Myra further testified that as a child, Marcus used to bite his hand and fingers. On three occasions, Marcus bit a plug of skin out of the palm of his hand. His hand became infected twice. Marcus would bite his fingernails completely off and would bite them until they bled. His fingernails have become infected at least 30 or 40 times over the past 13 years. Marcus had difficulty learning to write; he held the paper in place with the bottom part of his right forearm. He can hold a toothbrush with the thumb and index finger of his right hand, but he cannot hold heavy objects in those fingers. At age 13, Marcus cannot tie his shoes by himself; Myra assists him. Myra washes Marcus' hair, which remains dirty when Marcus attempts to wash it himself. Marcus helps with household chores, such as vacuuming and putting dishes in the dishwasher. Marcus can eat with his left hand, but Myra still cuts his food because Marcus accidentally cut his arm on one occasion.

According to Myra, when Marcus first started school, the other children made fun of Marcus and he would come home crying; this was no longer a problem. Marcus plays basketball, football and baseball with the other kids, albeit with limitations. If Marcus swings his right arm, he can get it over his head, but can only raise it himself to chest level. Once, Marcus told Myra he did not want to go to therapy

and that he wanted a doctor to remove his right arm because it did not serve any purpose.

Dr. Rekkas testified as to his professional background, including the fact that he has been board certified in obstetrics and gynecology since 1969. On September 8, 1976, Dr. Rekkas was called at home in the evening regarding Myra's pending delivery. Dr. Rekkas testified that he drove to the hospital, went to the delivery room and prepared for the delivery. As he entered the delivery area, Dr. Rekkas could see that a large part of the fetal scalp was visible at the vagina. Dr. Rekkas gave a regional anesthetic to numb the area around the birth canal, then made an incision in the vulva to enlarge the vaginal opening and prevent tissue tearing during delivery. Myra gave a push; Marcus' head delivered. Dr. Rekkas suctioned mucus from Marcus' nose and mouth and told Myra to push again.

Dr. Rekkas testified that at this point in the delivery, Marcus rotated in the birth canal; Marcus' right shoulder was pointed toward the ceiling, his left toward the floor. Dr. Rekkas asked Myra to push while he gently pressed down on Marcus' head. Dr. Rekkas repeated this maneuver after asking Myra to push harder and asking a nurse to apply pressure over the upper uterus. These efforts were unsuccessful attempts to get Marcus' shoulder under the arching bone structure which ties Myra's pelvic bones together in the front.

Dr. Rekkas realized that this was a case of shoulder dystocia. He then attempted to rotate Marcus to an oblique angle which would facilitate delivery. Marcus, however, did not move and was beginning to turn blue. Dr. Rekkas then reached into the underside of the birth canal in an attempt to extract Marcus' left arm. During part of this attempt, Dr. Rekkas applied suprapubic pressure to Myra's lower abdomen, while nurses applied lateral pressure to her upper abdomen. Marcus then rotated 180 degrees in the birth canal and was delivered.

On cross-examination, Dr. Rekkas testified that he touched Marcus' right shoulder only during the unsuccessful first attempt at delivery. Dr. Rekkas denied that he ever put his fingers underneath Marcus' right arm. Dr. Rekkas testified that to do so might cause damage to the child's nervous system.

Dr. Charles testified as to his professional qualifications as an obstetrician and gynecologist. Dr. Charles stated that the incidence of shoulder dystocia is somewhere between 1 in 500 and 1 in 1,000. He also stated that the incidence of Klumpke's paralysis is very rare, occurring in about 2% or 3% of all brachial plexus injuries, resulting in an incidence of about two cases out of every 100,000 births.

Dr. Charles then testified that he had reviewed hospital records of the delivery, records from Children's Memorial Hospital and Dr. Rekkas' deposition in connection with this case. Dr. Charles also stated that he later received other documents, at which time an objection was heard outside the presence of the jury. The trial court ruled that Dr. Charles could not be asked about matters not disclosed to the defense in discovery interrogatories. The trial court also ruled that Dr. Charles could not testify to opinions based on Dr. Rekkas' trial testimony.

Resuming his testimony before the jury, Dr. Charles opined that Dr. Rekkas deviated from the standard of care required of Marcus' delivery. Dr. Charles testified that Marcus' injury was such that it had to be sustained as the result of an improper maneuver. When asked what there was about the injury that led Dr. Charles to conclude that an improper maneuver had been performed, Dr. Charles stated that Marcus sustained an injury to the lower part of the brachial plexus, resulting in Klumpke's paralysis, which only occurs in 2% to 3% of brachial plexus injuries. Dr. Charles explained that the brachial plexus is a group of nerves located in the neck area which run under the muscles of the chest into the wall of the armpit and then spread out into the muscles of the arm and hand.

Dr. Charles opined that the only way Marcus' injury could have been caused was if fingers were hooked into Marcus' armpit, at which time defense counsel objected. In a sidebar, defense counsel argued that Dr. Charles did not give anything specific in his deposition and never mentioned hooking fingers into Marcus' armpit as a cause of the injury. Plaintiff's attorney responded that Dr. Charles was asked in his deposition only whether he saw anything specific in Dr. Rekkas' deposition or records which indicated a deviation from the standard of care. Plaintiff's attorney also noted Dr. Charles' deposition testimony regarding excessive force. The trial court overruled the objection.

Dr. Charles then testified that the only plausible explanation for the injury was that fingers were hooked into Marcus' armpit from below and that excessive force was used to pull Marcus down, rather than pushing against the chest wall. In response to a hypothetical question, Dr. Charles opined that Marcus' injuries could not have occurred if the right arm delivered itself naturally while the delivering physician manipulated only the left arm. Dr. Charles also opined that suprapubic pressure could not have caused the injury. Over objection, Dr. Charles further opined that if the nurses had provided fundal pressure during the delivery, this would not have caused the injury.

Dr. Charles also ruled out lateral pressure and the natural forces of childbirth as causes of the injury.

Dr. Charles then testified as to the maneuvers that should be performed in a case of shoulder dystocia. First, the doctor should attempt to rotate the child's shoulders to an oblique angle. Second, the doctor should attempt to rotate the child 180 degrees with a corkscrew maneuver. Finally, the doctor should slide his or her hand into the hollow of the mother's sacrum and attempt to deliver the lower shoulder.

On cross-examination, Dr. Charles admitted that Marcus did not have a fractured humerus after delivery, as Dr. Charles had stated in his deposition testimony. Dr. Charles agreed that his deposition did not contain specific criticisms of Dr. Rekkas. Dr. Charles also admitted that the pediatrician's report and a pediatric neurologist's report in this case carried indications that Marcus probably suffered from Erb's palsy. Dr. Charles further admitted that Erb's palsy is not always the result of negligence.

On redirect examination, Dr. Charles stated that he was mistaken in his prior testimony regarding whether Marcus' humerus was fractured. Dr. Charles then explained the difference between Erb's palsy and Klumpke's palsy. An Erb's palsy involves the upper brachial plexus and results in paralysis of the entire arm. A Klumpke's palsy involves the lower brachial plexus and results in a loss of nerves to the hand itself. Dr. Charles stated that Klumpke's palsy is likely to result from forceful hyperextension of the arm during delivery.

Dr. Robert Eilers testified that during an examination of Marcus performed in September 1985, he concluded that Marcus had a Klumpke's palsy. Dr. Eilers testified that Marcus' injury included a loss of sensation in the middle and ring fingers and a loss of muscle function in terms of wrist extension. Dr. Eilers stated that with this type of injury, grip strength is possibly gone, wrist extension is impaired and the ability of the triceps muscle to push out is injured. He also testified that Marcus will have problems with fine motor coordination, including using the fingers to appropriately grasp objects such as knives or to button buttons. He further testified that Marcus will have trouble pushing open a door with the injured arm and will have a problem pushing himself up from a chair. Dr. Eilers testified that Marcus cannot straighten his arm beyond a 45 degree angle; surgery would allow the arm to hang more cosmetically, but would not restore the function of the arm. Dr. Eilers stated that the injury was permanent. He also stated that physical therapy would be required to maintain the range of motion and to avoid further contracture of the arm

and osteoporosis. On cross-examination, Dr. Eilers admitted that in a prior deposition, he had stated that Marcus may also have Erb's palsy.

Marcus Stennis testified that he was then 13 years old. Marcus testified that he played football, basketball and baseball. In baseball, Marcus would catch the ball with his glove on his left hand, palm the ball with his right hand, pull the glove off with his arm and then throw the ball to the right person. Marcus grips the baseball bat with his left hand on the bottom and the right on top. Marcus catches a football by extending his arms and not letting the ball hit his chest. Marcus cannot shoot a basketball using only the right hand.

Marcus testified that other kids at school used to tease him and call him a cripple, but it didn't bother him and it did not happen as often today. Marcus demonstrated how he removes his jacket and unsuccessfully attempted to tie his shoelaces. Marcus also demonstrated the range of use of his arm and hand. He later demonstrated how he uses a toothbrush. Marcus testified as to a reduction in feeling in his right hand and portions of his right arm. Marcus also testified about infections resulting from biting his fingers and hand. Marcus stated that he once burned himself while cooking because he felt the heat of the pan, but did not feel pain. There was no cross-examination.

The parties stipulated that Marcus could expect to live for another 55.6 years, based on the Vital Statistics of the United States 1980 tables.

After plaintiff rested her case, Dr. Rekkas moved for a directed verdict. The motion also sought to strike Dr. Charles' testimony for giving opinions beyond the scope of his deposition. The trial court denied the motion both at this time and when the motion was renewed at the close of the case.

Defendant called another obstetrician and gynecologist, Dr. Robert Bouer, as his expert witness. Dr. Bouer agreed that Marcus suffered from a brachial plexus injury. However, Dr. Bouer testified that in evaluating whether Dr. Rekkas had met the applicable standard of care, it did not matter whether Marcus had Erb's or Klumpke's palsy, because they are the same type of general injury, resulting from a stretching of the nerves. Dr. Bouer testified that brachial plexus injuries have occurred in cases of hard contractions of the mother and in cases of normal delivery, but plaintiff's objections to testimony concerning Caesarean section deliveries and cases other than shoulder dystocia were sustained. Dr. Bouer testified that the mere occurrence of a brachial plexus injury does not mean that the delivering physician was negligent. Dr. Bouer opined that Dr. Rekkas had not deviated

from the applicable standard of care and that the maneuvers Dr. Rekkas had described were proper.

On cross-examination, Dr. Bouer admitted that Klumpke's palsy only occurs in about 3% of all brachial plexus injuries. Dr. Bouer stated that a drooping of the eye on the affected side is more associated with Erb's palsy than Klumpke's palsy. However, Dr. Bouer admitted that Dr. Greenhill's book on obstetrics, which Dr. Bouer had looked at in regard to this suit and which Dr. Bouer had seen people use in medical school, stated that a drooping of the eyelid on the affected side is associated with Klumpke's palsy. Dr. Bouer testified that he did not believe that Klumpke's palsy was especially apt to result from forceful hyperextension of the shoulder during delivery. However, after plaintiff's counsel directed Dr. Bouer's attention to a contrary opinion in Dr. Greenhill's book, Dr. Bouer stated that he did not have knowledge of that neurological position.

Following closing arguments, the jury deliberated and returned a verdict on October 3, 1979. The jury found for the plaintiff in the amount of $1,875,000. On November 14, 1989, the trial court granted Dr. Rekkas' motion for setoff, thereby reducing the verdict to $1,850,000. On January 17, 1990, the trial court denied Dr. Rekkas' post-trial motion for judgment notwithstanding the verdict or new trial. Dr. Rekkas timely filed a notice of appeal to this court.

## I

On appeal, defendant seeks a new trial or remittitur. A trial court's ruling on whether a new trial should be granted will not be reversed unless the verdict is against the manifest weight of the evidence. (See *Villa v. Crown Cork & Seal Co.* (1990), 202 Ill. App. 3d 1082, 1089, 560 N.E.2d 969, 973.) A verdict is deemed to be against the manifest weight of the evidence where the opposite conclusion is clearly evident or where the findings of the jury are unreasonable, arbitrary and not based on any of the evidence. (*Villa*, 202 Ill. App. 3d at 1089, 560 N.E.2d at 973.) This court may consider whether any errors in the exclusion or admission of evidence were sufficiently serious and prejudicial errors to warrant a new trial. (See *Bartlett Bank & Trust Co. v. McJunkins* (1986), 147 Ill. App. 3d 52, 63, 497 N.E.2d 398, 406.) A general verdict will not be set aside so long as one ground suffices to sustain the verdict "unless before the case was submitted to the jury a motion was made to withdraw that ground from the jury on account of insufficient evidence and it appears that the denial of the motion was prejudicial." Ill. Rev. Stat. 1987, ch. 110, par.

2—1201(d); see *Lynch v. Board of Education of Collinsville Community Unit District No. 10* (1980), 82 Ill. 2d 415, 412 N.E.2d 447.

## A

Defendant contends that the trial court erred in admitting a number of Dr. Charles' opinions, arguing that they were inconsistent with or beyond the scope of Dr. Charles' deposition testimony. Illinois Supreme Court Rule 220 provides:

> "To the extent that the facts known or opinions held by an expert have been developed in discovery proceedings through interrogatories, depositions or requests to produce, his direct testimony at trial may not be inconsistent with or go beyond the fair scope of the facts known or opinions disclosed in such discovery proceedings. However, he shall not be prevented from testifying as to facts or opinions on matters regarding which inquiry was not made in the discovery proceedings." (134 Ill. 2d R. 220(d).)

(See also *Friedland v. Allis Chalmers Co. of Canada* (1987), 159 Ill. App. 3d 1, 7, 511 N.E.2d 1199, 1204 (trial court barred testimony that expert reviewed X ray and myelogram films where expert stated the contrary at deposition).) This rule also requires the parties to seasonably supplement answers to interrogatories as additional information becomes known to them or their attorneys. (134 Ill. 2d R. 220(c)(3).) This court has applied this requirement to expert witnesses. (*Ramos v. Pyati* (1989), 179 Ill. App. 3d 214, 228, 534 N.E.2d 472, 480.) Typically, decisions regarding sanctions for violations of discovery rules rest within the discretion of the trial court. See 134 Ill. 2d R. 219(c).

The restrictions of Rule 220 may be enforced by a motion *in limine*, a potent weapon which seeks to exclude inadmissible evidence at trial. However, oral *in limine* motions and orders provide fertile ground for confusion; consequently, motions and orders *in limine* should be clearly and specifically outlined in writing. An order *in limine*, like any other interlocutory order, is subject to reconsideration by the court throughout the trial. The trial court should correct or interpret the order to allow a party to present his or her case while excluding inadmissible evidence. (See *Crawford County State Bank v. Grady* (1987), 161 Ill. App. 3d 332, 340-41, 514 N.E.2d 532, 538.) A violation of an order *in limine* may warrant a new trial only where the order is specific and the violation is clear. See *In re Estate of Loesch* (1985), 134 Ill. App. 3d 766, 770, 481 N.E.2d 32, 35.

### 1

■ Defendant first objects to Dr. Charles' testimony that Marcus suffers from Klumpke's palsy. The record indicates that defendant did not object to this opinion when it was given at trial. Thus, defendant has waived this objection on appeal. *Hunter v. Chicago & North Western Transportation Co.* (1990), 200 Ill. App. 3d 458, 472, 558 N.E.2d 216, 225.

Even if defendant had preserved the argument, it is not clear that the opinion should have been excluded. Defendant has not identified the relevant order *in limine* and admits in his brief that the motion on which it was based does not appear in the record on appeal. The record indicates that during a sidebar at trial, the trial court limited the opinions Dr. Charles could give. Nevertheless, the record also indicates that Dr. Charles' deposition testimony was that Marcus suffered from a brachial plexus injury. It is undisputed that Klumpke's palsy is such an injury. Thus, the trial opinion appears on its face to be an elaboration on the deposition opinion, which would not violate Rule 220. See *McGuckin v. Chicago Union Station* (1989), 191 Ill. App. 3d 982, 1001, 548 N.E.2d 461, 474.

Defendant contends that the opinion should not have been admitted because Dr. Charles could not have opined that Marcus had Klumpke's palsy, based on the records and evidence supplied to him at the time of the deposition. Thus, unlike *McGuckin*, the opinion could not have been elicited at the deposition through the use of more specific questions. This argument appears to be supported by the record. Nevertheless, the record also indicates that Myra had already testified that she had taken Marcus to numerous physicians and therapists and that Marcus had Klumpke's palsy. Although this statement was possibly hearsay, defendant did not object to it, thus allowing it to be given its natural probative effect. (*E.g., Jackson v. Board of Review of the Department of Labor* (1985), 105 Ill. 2d 501, 508, 475 N.E.2d 879, 883.) Moreover, the record shows that Dr. Eilers also diagnosed Marcus as having Klumpke's palsy. Thus, even if Dr. Charles' opinion was based on facts and data obtained after his deposition, the opinion was merely cumulative of other testimony and not unfairly prejudicial.

### 2

■ Defendant next contends that the trial court erroneously allowed Dr. Charles to testify that there are two types of brachial plexus injuries, Erb's palsy and Klumpke's palsy, and that the former is not always caused by negligence of the delivering physician, but the

latter is always caused by negligence. Again, defendant failed to object to such testimony when it was given and appears to have waived the objection on appeal. *Hunter*, 200 Ill. App. 3d at 472, 558 N.E.2d at 225.

Even if defendant had not waived the argument, the record indicates that Dr. Charles' opinion on this point was not inconsistent with his deposition testimony, for defendant did not ask Dr. Charles about the different types of brachial plexus injuries. Moreover, the opinion that Klumpke's palsy is always caused by negligence is general in nature and would not depend on which records Dr. Charles reviewed in this case. Thus, this opinion did not violate Rule 220.

### 3

■ Defendant's third evidentiary objection is to Dr. Charles' opinion that the only way the injury logically could have occurred was if Dr. Rekkas had hooked his fingers into Marcus' armpit and used force to pull Marcus down during the delivery. Defendant contends that this opinion should have been barred because plaintiff's attorney had represented to defendant and the trial court that Dr. Charles did not have a specific criticism about the maneuvers Dr. Rekkas used in delivering Marcus. A misrepresentation by an attorney regarding the scope of expert testimony may serve as a basis for limiting or striking a witness' surprise testimony. See *Ramos*, 179 Ill. App. 3d at 229-31, 534 N.E.2d at 482.

The record indicates that the following discussion was had during a sidebar at trial:

> "[DEFENSE COUNSEL]: You had his [Dr. Rekkas'] discovery deposition. He [Dr. Charles] reviewed his [Dr. Rekkas'] discovery deposition, he relied on it. He didn't have any specific criticism *about it* either at the time he took this deposition.
>
> [PLAINTIFF'S ATTORNEY]: That's right. And he still doesn't." (Emphasis added.)

The record therefore indicates that plaintiff's attorney represented that Dr. Charles had no specific criticism based on Dr. Rekkas' *deposition* and did not represent that Dr. Charles had no specific criticism of Dr. Rekkas' performance whatsoever.

Nevertheless, the record shows that Dr. Charles' deposition testimony contained no specific criticism of Dr. Rekkas. Moreover, it is unclear from Dr. Charles' deposition whether his opinion that excessive force had been used stemmed solely from his mistaken impression that Marcus' arm had been fractured or whether this opinion also related to the brachial plexus injury itself. It therefore seems possible

that Dr. Charles' trial testimony that Dr. Rekkas must have slipped his fingers into Marcus' armpit may have surprised Dr. Rekkas.

Yet even if this court were to assume both that this opinion should have been disclosed before trial and that the admission of that opinion was error, a new trial would not be required. It is undisputed that one of the theories advanced by plaintiff at trial was *res ipsa loquitur*. The record shows that evidence was admitted from which a jury could conclude that: Marcus suffers from Klumpke's palsy; the injury was received while the delivery of the shoulder dystocia was under defendant's control and management; and in the normal course of events, the injury would not have occurred if the defendant had used ordinary care during the delivery of the shoulder dystocia. Given this record, the jury may have based its verdict for plaintiff on the *res ipsa loquitur* theory. Thus, even if admitting the opinion regarding excessive force applied to Marcus' armpit were deemed error, a new trial would not be mandated in this case. Ill. Rev. Stat. 1987, ch. 110, par. 2—1201(d).

4

■ Fourth, defendant objects to a number of opinions that the following could have not caused the injury in this case: (1) fundal pressure; (2) suprapubic pressure; (3) lateral pressure; and (4) the natural forces of childbirth. The record indicates that defendant's sole objection to these opinions at trial was to the opinion regarding the nurses' use of fundal pressure during the delivery. Accordingly, the other objections are waived.

Even assuming *arguendo* that they were not waived, defendant's argument is not persuasive. The record shows that Dr. Charles was not asked about these topics at his deposition; thus, Dr. Charles could render an opinion on these topics at trial without violating Rule 220. (*Crawford County State Bank*, 161 Ill. App. 3d at 342, 514 N.E.2d at 538-39.) Moreover, the record indicates that the trial court stated in a hearing on the motions *in limine* that defendant *could* have an order barring criticism of the use of fundal pressure, not that a written order was entered. Even if such an order had been entered, the record indicates that Dr. Charles testified that these techniques could not have caused the injury, which does not appear to be a criticism of their use.

In sum, defendant has waived a number of the evidentiary objections he has raised on appeal by failing to object at trial. Defendant also has failed to show that the admission of Dr. Charles' opinions was reversible error.

## B

Defendant also claims that the trial court erroneously admitted speculative testimony on damages. Defendant claims that the verdict was influenced by testimony concerning Marcus' nail biting and his desire to have his arm cut off.

■ Defendant relies on *Lauth v. Chicago Union Traction Co.* (1910), 244 Ill. 244, 251, 91 N.E. 431, 434, in which our supreme court stated that evidence of future damages cannot be admitted unless the consequences relied upon are reasonably certain to result. However, defendant's premise—that the testimony in this case that Marcus bit his fingers, hand and fingernails until they bled and became infected was introduced to show that the injury caused the nail biting—is flawed. The evidence could be introduced to show the extent of the loss of feeling in Marcus' hand, which is a current disability. Thus, the trial court did not err in permitting this testimony, even if the nail biting was a voluntary habit.

■ As for Myra's testimony that Marcus once told her that he would like the injured arm removed because it served no purpose, the record indicates that defendant's motion *in limine* to bar this testimony was denied, but that the trial court indicated that it would rule on any hearsay problems as they came up. The record further indicates that defendant did not object to this testimony at trial. Thus, the argument is waived on appeal.

## II

■ Defendant next contends that the trial court erred by allowing plaintiff's attorney to make misstatements of law and prejudicial remarks regarding the issue of damages during closing arguments. Although it is the function of the trial court to instruct the jury as to the law, attorneys can, and necessarily must, state what they believe the law to be and base their factual arguments on that interpretation. (*Lounsbury v. Yorro* (1984), 124 Ill. App. 3d 745, 748-49, 464 N.E.2d 866, 868.) Nevertheless, an attorney may not mislead the jury with such remarks. (See *Lounsbury*, 124 Ill. App. 3d at 749, 464 N.E.2d at 868.) In general, the permissible scope of argument rests within the discretion of the trial court and will not be reversed absent a clear abuse of that discretion. (*Dotson v. Sears, Roebuck & Co.* (1987), 157 Ill. App. 3d 1036, 1043, 510 N.E.2d 1208, 1212.) Although improper closing arguments may warrant a new trial, this court generally grants a new trial only where the arguments were clearly improper, prejudicial and denied the complaining party a fair trial when that

trial is viewed in its entirety. See *Skelton v. Chicago Transit Authority* (1991), 214 Ill. App. 3d 554, 581-82, 573 N.E.2d 1315, 1334.

Defendant claims that plaintiff's attorney misstated the burden of proof in a civil case and improperly mentioned the burden of proof applicable in civil cases. The transcript of proceedings indicates the following argument was made:

"[PLAINTIFF'S ATTORNEY]: Now, the term burden of proof sounds like it might be something insurmountable. And in some cases it might be. But in this case it's not. All that burden of proof means is that the plaintiff has to show you evidence from which you conclude that a particular thing is more probably true than not true.

After the plaintiff does that, the plaintiff has met the burden of proof that the law requires.

If you think of it in terms of a balance beam scale—

[DEFENSE COUNSEL]: Objection, your Honor.

THE COURT: Overruled.

[PLAINTIFF'S ATTORNEY]: Where both sides start out even, you place all of Marcus' evidence on one side and you place any of Dr. Rekkas' evidence on the other side. If that scale moves at all, at all, towards the plaintiff, then you must find in the plaintiff's favor.

This isn't a case where you have to be convinced of something beyond any doubt or beyond a reasonable doubt as is required in TV shows and in criminal cases.

The law says that in a civil case, some doubt is all right.

[DEFENSE COUNSEL]: Objection, your honor.

THE COURT: The objection to that is sustained. I'll instruct them as to the law.

[PLAINTIFF'S ATTORNEY]: As long as you are convinced that a particular proposition or a particular fact is probably more true than not true."

On appeal, defendant claims that the reference to "all" of plaintiff's evidence as against "any" of defendant's evidence misstates the civil burden of proof. The record shows that defendant objected to the "balance beam scale" metaphor before plaintiff's attorney referred to "any" or "all" of a party's evidence. Yet in *Lounsbury*, upon which defendant relies, this court held that a trial court erred in *preventing* an attorney from using a similar "scales of justice" metaphor. (*Lounsbury*, 124 Ill. App. 3d at 749, 464 N.E.2d at 869.) Consequently, the trial court's ruling was correct when it was made.

Even if this court were to assume that defendant was presciently objecting to the "all"/"any" comparison, and were to assume further that the comparison was improper, the portion of the record quoted above indicates that plaintiff's attorney correctly stated the burden of proof both before and after the disputed comment. (See *Lounsbury*, 124 Ill. App. 3d at 751, 464 N.E.2d at 870.) The record also indicates that this comment was brought to the trial court's attention in defendant's post-trial motion. Generally, this court will defer to the decision of the trial court, which heard the argument and observed any effect it had upon the jury, as to whether the argument was so prejudicial as to warrant a new trial. (See *Carlasare v. Wilhelmi* (1985), 134 Ill. App. 3d 1, 7, 479 N.E.2d 1073, 1077.) Given the record on appeal, defendant has failed to demonstrate reversible error in this instance.

■■■ Plaintiff's attorney's reference to the burden of proof in criminal cases was not proper because it is immaterial and may confuse the jury. (*Lounsbury*, 124 Ill. App. 3d at 750, 464 N.E.2d at 869.) Even so, this court will not reverse the jury's verdict unless the argument unduly prejudiced defendant or unduly affected the outcome of the trial, especially where defendant has not claimed that the verdict is against the manifest weight of the evidence. (*Lounsbury*, 124 Ill. App. 3d at 750-51, 464 N.E.2d at 869-70.) The record indicates that defendant's objection to this argument was sustained. Although the trial court did not specifically instruct the jury to disregard the remark at the time it was made, the trial court did state that it would instruct the jury as to the law at that time. Moreover, defendant explicitly states in his reply brief that he is not claiming that the verdict was against the manifest weight of the evidence. Consequently, the remark does not warrant a new trial.

■■■ Defendant next claims that plaintiff's attorney misstated the law regarding future lost wages. The record indicates that defendant did not object to this argument at trial. Accordingly, defendant has waived the argument on appeal.

In any event, the argument is not persuasive. The comment to which defendant objects was: "From the mere fact that a minor was injured, the law allows you to infer that it's going to affect his employability." Defendant notes that the applicable jury instruction allows this inference when the injury is permanent. However, the record indicates that Drs. Charles and Eilers testified that the injury was permanent and defendant has failed to identify any evidence to the contrary. Thus, the remark did not affect the outcome in this case.

■ Defendant further argues that plaintiff's attorney improperly referred to an unrelated case on the issue of damages. Defendant's objection on this point was overruled.

The record indicates that plaintiff's attorney referred to a case involving Texaco and Exxon, mentioning a verdict of $60 billion "or whatever it was they came up with." Plaintiff's brief identifies this as a reference to a case involving Pennzoil and Texaco concerning a breach of contract. It would appear that plaintiff's attorney meant to refer to the litigation encompassing *Pennzoil Co. v. Texaco, Inc.* (1987), 481 U.S. 1, 95 L. Ed. 2d 1, 107 S. Ct. 1519, which involved a verdict closer to $10 billion. It is typically improper to refer to judgments awarded in other cases. (See *Dotson*, 157 Ill. App. 3d at 1042, 510 N.E.2d at 1211, citing *Richardson v. Nelson* (1906), 221 Ill. 254, 77 N.E. 583, *overruled on other grounds by People ex rel. Noren v. Dempsey* (1957), 10 Ill. 2d 288, 139 N.E.2d 780.) Nevertheless, the record indicates that the comment was brief and the verdict, while significant, was not in the $60 billion range. Thus, the comment does not warrant a new trial.

■ Defendant's next argument in this vein is that plaintiff's attorney attempted to circumvent a prior ruling of the trial court by implying that Marcus had suffered brain damage. The record indicates that the trial court barred testimony that Marcus suffered brain damage because there was no expert testimony as to causation. The transcript of proceedings indicates that plaintiff's attorney argued that if Marcus had been born with incapacitating brain damage due to Dr. Rekkas' negligence, he would be suggesting $30 or $40 million in damages. This argument does not appear to imply that Marcus had brain damage; indeed, the argument suggests that he did not.

■ Defendant's final objection to closing arguments is that plaintiff's attorney improperly expressed his own opinion on the issue of damages. (See, *e.g., Robinson v. Wieboldt Stores, Inc.* (1982), 104 Ill. App. 3d 1021, 1027, 433 N.E.2d 1005, 1010; *Goad v. Grissom* (1944), 324 Ill. App. 123, 127-28, 57 N.E.2d 514, 516.) However, argument which merely suggests possible figures to the jury is not always inflammatory or improper. (See *Thompson v. Lietz* (1981), 95 Ill. App. 3d 384, 391, 420 N.E.2d 232, 238.) The record indicates that plaintiff's attorney argued: "What would somebody pay not to have to put up with that injury? You say it all the time, I won't take five million dollars to have my arm like that." This argument, unlike the argument disapproved in *Goad*, does not appear to reflect the attorney's own personal opinion; rather, it refers to "somebody" or "you." Such argument could be considered improper insofar as the use of "you"

could be construed as an attempt to place the jurors in plaintiff's shoes. (See *Robinson*, 104 Ill. App. 3d at 1027, 433 N.E.2d at 1010.) On the other hand, the use of "somebody" suggests that counsel meant to refer to the reasonable person standard rather than the attorney's personal predilection. Such argument would be proper. (See *Bruske v. Arnold* (1969), 44 Ill. 2d 132, 137-38, 254 N.E.2d 453, 456.) Given this record, we cannot say that this comment warrants a new trial.

In sum, the record indicates that some of the plaintiff's closing arguments in this case were not proper. However, given the record on appeal, we cannot conclude that these comments warrant a new trial, even when considered in the context of the trial as a whole.

## III

■■■ Next, relying on *Stephans v. Chicago Transit Authority* (1960), 28 Ill. App. 2d 229, 171 N.E.2d 229, defendant argues that he was prejudiced when Myra began to cry during her testimony, requiring a recess. However, the record indicates that defendant did not move for a mistrial at the time, nor did he object or otherwise indicate that he believed he was prejudiced at the time. Thus, the argument is waived on appeal.

Nor would the argument have persuaded this court if it had been preserved. The question of whether a crying witness prejudiced the complaining party rests within the discretion of the trial court. (*German v. Illinois Power Co.* (1983), 115 Ill. App. 3d 977, 986, 451 N.E.2d 903, 909.) Given the record on appeal, which indicates that the trial court was aware that a crying witness can be prejudicial, but was also concerned that unduly restricting Myra might make her appear less credible to the jury, defendant has failed to show an abuse of discretion.

## IV

■■■ Finally, defendant argues that the damages awarded were excessive. A reasonable balance between the damages awarded and injury suffered should be struck; however, there is no precise rule for awarding damages in personal injury cases because compensation of this sort does not lend itself to mathematical computation. (*Johanek v. Ringsby Truck Lines, Inc.* (1987), 157 Ill. App. 3d 140, 155, 509 N.E.2d 1295, 1305.) Assessment of damages is a function of the jury; thus, a court will generally not substitute its judgment for that of the jury on this issue. (*Haid v. Tingle* (1991), 219 Ill. App. 3d 406, 410, 579 N.E.2d 913, 916.) Accordingly, the test for whether a judgment or

verdict is excessive is whether the total amount falls within the necessarily flexible limits of fair and reasonable compensation or whether the award is so large as to shock the conscience of the court. (See *Lewis v. Cotton Belt Route—St. Louis Southwestern Ry. Co.* (1991), 217 Ill. App. 3d 94, 123, 576 N.E.2d 918, 940.) Whether the damage award is excessive must be determined from a consideration of the permanence and extent of the injury, possible future deterioration, medical expenses and any restrictions on daily activities imposed by the injury. *Young v. Hummel* (1991), 216 Ill. App. 3d 303, 310, 576 N.E.2d 1072, 1077.

■■■ In this case, the record indicates that the jury awarded damages as follows: (1) $975,000 for disability and disfigurement; (2) $500,000 for loss of earning capacity; and (3) $400,000 for pain and suffering. This $1,875,000 verdict was reduced to $1,850,000 upon Dr. Rekkas' motion for setoff.

The record in this case shows that plaintiff presented evidence to the jury of the sort required by case law. Given the record, the damages awarded do not shock the conscience of this court.

For the aforementioned reasons, we affirm the judgment of the circuit court of Cook County.

Affirmed.

O'CONNOR and MANNING, JJ., concur.