**Stacey LUSTER and Walter Luster, individually and as parents and next friends of Alyssa Luster, a minor, Plaintiffs–Appellants,**

**v.**

**Judith BRINKMAN, MD, and Colorado Springs Health Partners, P.C., Defendants–Appellees.**

**No. 06CA2443.**

Colorado Court of Appeals,
Div. II.

July 10, 2008.

Rehearing Denied Oct. 2, 2008.

* Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and

§ 24–51–1105, C.R.S.2007.

Leventhal, Brown & Puga, P.C., Natalie Brown, Benjamin Sachs, Denver, Colorado, for Plaintiffs–Appellants.

Jaudon & Avery LLP, David H. Yun, Jared R. Ellis, Denver, Colorado; Wheeler Trigg Kennedy LLP, Kevin J. Kuhn, Denver, Colorado; Kennedy, Childs & Fogg, P.C., Christopher K. Miller, Denver, Colorado, for Defendants–Appellees.

Opinion by Judge NIETO.[*]

In this medical malpractice case, plaintiffs, Stacey Luster and Walter Luster, individually and as parents and next friends of Alyssa Luster, appeal the judgment entered on a jury verdict for defendants, Dr. Judith Brinkman and Colorado Springs Health Partners, P.C. The jury found that Dr. Brinkman was not negligent, and did not cause Alyssa's injuries. We affirm.

## I. Background

The following facts are undisputed. On July 5, 2002, Dr. Brinkman and Stacey Luster (Mother) decided to induce labor because Mother's due date was July 3, and she had been experiencing maternal discomfort. On July 6, 2002, Mother gave birth to Alyssa.

In order for delivery to occur, a baby's body must descend through the pelvic inlet. During the birthing process, the position or orientation of a baby's shoulders will change in relation to the orientation of the mother's body.

During childbirth, Alyssa descended the birth canal toward the vaginal opening, and was facing Mother's right leg while the back of her head was against Mother's left leg. Brinkman noted a change in the fetal heart monitoring strip, and became concerned that the umbilical cord may have wrapped around Alyssa's neck. Dr. Brinkman decided to apply a vacuum extractor to Alyssa's head in order to assist her descent. Alyssa's head began to appear through the vaginal opening after the second attempt with the vacuum extractor. Alyssa then stopped moving down the birth canal.

Dr. Brinkman clamped and cut Alyssa's umbilical cord to prevent a tearing or rupture of the cord. However, Alyssa still did not descend. Dr. Brinkman diagnosed shoulder dystocia, an obstetrical emergency which occurs when a baby's shoulder or shoulders become stuck during vaginal delivery after a baby's head has been delivered.

Shoulder dystocia often results in damage to a baby's brachial plexus, a network of nerves in the shoulder and neck region. These nerves control the muscles of the shoulder, arm, elbow, wrist, hand, and fingers.

Dr. Brinkman and the attending nurses performed a combination of three procedures to facilitate delivery. They simultaneously applied suprapubic pressure, a midline episiotomy, and the McRoberts position to attempt to relieve the shoulder dystocia. After the head was delivered, Dr. Brinkman used a downward traction to fully deliver the baby.

Following childbirth, Alyssa was diagnosed with a brachial plexus injury to her left shoulder. Alyssa's left shoulder was in the posterior position, or the "down" position during childbirth.

Plaintiffs brought suit against Dr. Brinkman and Colorado Springs Health Partners, P.C., alleging medical negligence. Before

---

[*] Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and

§ 24–51–1105, C.R.S.2007.

trial, plaintiffs filed a *Shreck* motion to preclude defendants' expert testimony pursuant to *People v. Shreck,* 22 P.3d 68 (Colo.2001). Plaintiffs' motion sought to exclude Dr. Blackwell's, Dr. Jordan's, and Dr. Brinkman's testimony that intrauterine forces caused Alyssa's injuries. Defendants then filed a *Shreck* motion to preclude plaintiffs' expert, Dr. O'Leary, from testifying that Alyssa's injuries were caused by excessive traction. The trial court denied both motions on the first day of trial. At trial, Dr. Blackwell testified that intrauterine contractions can cause brachial plexus injuries. Dr. Jordan and Dr. Brinkman did not testify to the causation of Alyssa's injury.

During jury deliberations, the jury sent the court two questions. The first asked: "We are hung 3 for negligence 3 for non negligent—How do we fill out the forms A or B?" The second question asked: "We have come to a decision. The decision was based primarily on one of the instructions. Not all were in agreement with our final decision however. Some feel they were forced to a decision they do not agree with. Can the jury make a comment regarding the decision?"

The trial court provided two supplemental instructions for the jury. The first, a modified-*Allen* instruction, stated in part:

It is your duty, as jurors, to consult with one another and to deliberate with a view to reaching a verdict, if you can do so without violence to individual judgment. Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors. In the course of your deliberations, do not hesitate to reexamine your own views and change your opinion if convinced it is erroneous. But do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict.

You are not partisans. You are judges—judges of the facts. Your sole interest is to ascertain the truth from the evidence in the case.

I would suggest that you also consider calling it "quits" for the day then returning in the morning. Jurors often find that going home and thinking about it overnight and then returning to try again when they are fresh is useful. Let us know if you wish to try this.

The second instruction stated in part:

You are required to follow the law as contained in the instructions. Please recall my earlier instruction that you don't have to agree with the law, you must merely agree to follow the law. However, no one should feel that they are being "forced" to make a decision that is not based upon all of the evidence they have received and law as the court has instructed you. If you have questions(s) [sic] about a particular instruction, or anything else that is of concern, we will do our best to answer it.

Ten minutes later, the jury announced it had reached a verdict. The court proceeded to ask the jurors whether the verdict accurately reflected their judgments. Three jurors indicated they had trouble with their decisions and ultimately decided based on Jury Instruction 15, the physician standard of care instruction.

Plaintiffs moved for a mistrial, which the court denied. The court also denied plaintiffs' request to conduct a more specific inquiry into whether the jurors felt they were forced to make a decision. This appeal followed.

## II. *Shreck* Motion

Plaintiffs contend the trial court erred by denying their motion to exclude defendants' expert testimony that Alyssa's injury was caused by intrauterine forces and was unrelated to Dr. Brinkman's efforts to relieve the shoulder dystocia. Plaintiffs argue that under *Shreck,* this testimony should have been excluded because the testimony was unreliable and the experts were unqualified. We disagree.

█ Trial courts are vested with broad discretion to determine the admissibility of expert testimony. *People v. Ramirez,* 155 P.3d 371, 380 (Colo.2007). The trial court is vested with this discretion because it has a

superior opportunity to determine the competence of the expert. *Masters v. People*, 58 P.3d 979, 988 (Colo.2002). In addition, this deference reflects the superior opportunity of the trial judge to gauge both the competence of the expert and the extent to which the opinion would be helpful. *Id.* As such, a trial court's exercise of its discretion will not be overturned unless manifestly erroneous. *City of Aurora ex rel. Utility Enterprise v. Colorado State Engineer*, 105 P.3d 595, 612 (Colo.2005).

■ CRE 702 governs the admission of expert testimony. *Shreck*, 22 P.3d at 77–78. In determining whether expert testimony is properly admitted, the trial court should consider two factors: (1) whether the scientific principles as to which the witness is testifying are reasonably reliable, and (2) whether the witness is qualified to opine on such matters. *Id.* at 70.

■ In evaluating the reliability of expert testimony, trial courts should conduct a broad inquiry that considers the totality of the circumstances involved in each case. *Golob v. People*, 180 P.3d 1006, 1011 (Colo.2008)(citing *Shreck*, 22 P.3d at 70). Additionally, trial courts should evaluate the testimony under CRE 403 to ensure that the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice. CRE 403; *Golob*, 180 P.3d at 1011. Finally, trial courts should issue specific findings as they apply the CRE 702 and 403 analyses. *Shreck*, 22 P.3d at 70.

### A. Dr. Blackwell's Qualifications

Plaintiffs do not specifically argue that Dr. Blackwell was unqualified to provide his opinions on the causes of brachial plexus injuries. However, they assert Dr. Blackwell's methods of research were unscientific and his conclusions were speculative. This is a challenge to his qualifications, and therefore we address the issue.

■ CRE 702 controls the qualification of experts. *Golob*, 180 P.3d at 1012. The rule is broadly phrased and provides that an expert may be qualified by any one of the five factors specified in the rule: knowledge, skill, experience, training, or education. *Huntoon v. TCI Cablevision of Colo.*, 969 P.2d 681, 690 (Colo.1998). In making its determination, a trial court should assess the witness's qualifications in the context of the evidence that is presented to the jury. *Golob*, 180 P.3d at 1012 (citing *Shreck*, 22 P.3d at 77).

■ At the hearing on plaintiffs' *Shreck* motion to preclude defendants' expert testimony, as well as evidence of Dr. Blackwell's qualifications presented to the jury, the trial court found Dr. Blackwell qualified to testify as an expert in obstetrics and gynecology. The court based this finding on the doctor's practice in the field for over twenty years. Dr. Blackwell is board certified in obstetrics and gynecology and has delivered over a thousand babies in his career. He has held academic and teaching positions. He is board certified in maternal fetal medicine and has extensive knowledge of shoulder dystocia and brachial plexus injuries. At trial, Dr. Blackwell testified extensively about his experience researching and co-authoring the American College of Obstetricians and Gynecologists' practice bulletin on shoulder dystocia.

Accordingly, we conclude that the trial court's determination regarding Dr. Blackwell's qualifications is supported by the record, and it was not error to admit his testimony at trial.

### B. Reasonably Reliable Theories

■ Plaintiffs next argue Dr. Blackwell's expert testimony regarding the cause of Alyssa's brachial plexus injury was inherently unreliable because his testimony was not based on accepted medical science. Plaintiffs claim the testimony relied on mere theories and hypotheses, rather than tested and proven medical standards. We disagree.

■ A trial court's reliability inquiry under CRE 702 should be broad in nature and consider the totality of the circumstances of each specific case. *Shreck*, 22 P.3d at 77. Among the factors a trial court may consider are: (1) whether the technique can be and has been tested; (2) whether the technique has been subject to peer review and publication; (3) the existence and maintenance of standards controlling the technique's opera-

tion; (4) the frequency and type of error generated by the technique; and (5) whether such evidence has been offered in previous cases to support or dispute the merits of a particular scientific procedure. *Id.* at 77–78.

Here, the trial court made the following findings, supported by the record, regarding the methods underlying Dr. Blackwell's testimony: (1) the testimony regarding intrauterine causes of brachial plexus injuries was helpful to the jury because it was not clear how this injury came about; (2) the expert testimony assisted the jury because it offered contrary medical opinions from which the jury could choose the theory it found more convincing-that brachial plexus injuries can only occur from traction, or alternatively, that brachial plexus injuries can be caused by an intrauterine injury; (3) there is support in reliable medical literature, although it is contested, that there can be intrauterine causes of brachial plexus injuries that occur without the negligence of the attending physician; (4) the doctor's medical theories were based on reliable scientific principles, which can come out of his personal experience in the area; and (5) the probative value of such evidence outweighs any risk of prejudice.

Plaintiffs argue that *Precis: An Update in Obstetrics and Gynecology,* and other similar literature relied upon by Dr. Blackwell, are not sufficiently reliable. However, plaintiffs fail to provide, and we are not aware of, any authority supporting their argument that *Precis* and other such literature are medical publications which are not reasonably relied upon by experts in the field. *See* CRE 703 (expert witness may rely on facts and data "of a type reasonably relied upon by experts in the particular field"). *Precis* is published by the American College of Obstetricians and Gynecologists, which determines board certification for obstetricians and gynecologists.

■ Plaintiffs' arguments are premised on theories of causation which have rejected the body of literature finding that intrauterine forces can cause brachial plexus injuries. Where, as here, competing evidentiary theories exist, it is the fact finder's function to consider what weight should be given to all parts of the evidence. *Kogan v. People,* 756 P.2d 945, 950 (Colo.1988). This includes the

resolving of conflicts, inconsistencies, and disputes in the evidence. *Id.* As the trial court stated, it was up to the jury to determine which theory of causation to believe.

Further, other courts have allowed expert testimony that intrauterine contractions can cause brachial plexus injuries. *See, e.g., Clark v. Heidrick,* 150 F.3d 912, 915 (8th Cir.1998); *Silong v. United States,* 2007 WL 2712100, at *3–4 (E.D. Cal. No. CV F 06–0474 LJO DLB, Sept. 14, 2007) (unpublished decision); *Potter v. Bowman,* 2006 WL 3760267, at *2 (D.Colo. No. 05–cv–00827–REB–PAC, Dec. 18, 2006) (unpublished order); *Stennis v. Rekkas,* 233 Ill.App.3d 813, 175 Ill.Dec. 45, 599 N.E.2d 1059, 1065 (1992); *Reilly v. Straub,* 282 N.W.2d 688, 690 (Iowa 1979); *Salvant v. State,* 935 So.2d 646, 656–57 (La.2006); *D'Amore v. Cardwell,* 2008 WL 852791, at *7 (Ohio Ct.App. No. L–06–1342, Mar. 31, 2008) (unpublished opinion); *Rieker v. Kaiser Foundation Hospitals,* 194 Or.App. 708, 96 P.3d 833, 837 (2004). Plaintiffs have cited no cases, and we are aware of none, holding such expert testimony inadmissible at trial.

Applying the totality of the circumstances standard, we conclude the trial court did not abuse its discretion in admitting the evidence because of any lack of reliability. Therefore, we conclude the trial court did not abuse its discretion in ruling defendants' expert testimony was reasonably reliable and admitting it.

### III. Modified-*Allen* Instruction

■ Plaintiffs contend the trial court abused its discretion in giving supplemental jury instructions which amounted to a modification of the modified-*Allen* instruction. Plaintiffs argue the modified language in the court's instructions improperly coerced the jury to reach a verdict. We disagree.

■ Upon learning that a jury is unable to agree on a verdict, the trial court may not give an instruction that is potentially coercive, but may, in its discretion, give a "modified-*Allen*" instruction. *Allen v. People,* 660 P.2d 896 (Colo.1983); *People v. Raglin,* 21 P.3d 419, 423 (Colo.App.2000). The decision whether to use the modified-*Allen*

instruction is left to the discretion of the trial court, and its ruling may not be reversed unless it abuses that discretion. *People v. Schwartz*, 678 P.2d 1000, 1011 (Colo.1984).

 The modified-*Allen* instruction should inform the jurors that (1) they should attempt to reach a unanimous verdict; (2) each juror should decide the case for himself or herself after impartial consideration with the others; (3) they should not hesitate to re-examine their views and change their opinions if convinced they are incorrect; and (4) they should not surrender their honest convictions solely because of the opinions of other jurors or for the purpose of returning a verdict. *Allen*, 660 P.2d at 898 (citing CJI–Crim. 38:14 (1983) ).

Here, contrary to plaintiffs' contention, the court's instructions were not coercive, but merely encouraged the jury to reach a unanimous verdict. It was not, in our view, coercive for the court to encourage continued deliberation by suggesting the jury call it "quits" for the day and return in the morning to continue deliberating. Further, in its second supplemental instruction, the court specifically told the jurors no one should feel forced to make a decision.

The first supplemental instruction, which tracked the language contained in *Allen* and CJI–Crim. 38:14, did not impliedly or expressly authorize the jury to render a compromise verdict. The trial court's instruction merely reminded the jury of the method of arriving at a deliberative verdict and instructed the jurors as to the nature of their duties. There was nothing about the manner in which it was given or any comments made by the court that could have had a coercive effect on the jury.

The supplemental instructions tracked earlier instructions given by the court telling the jurors that it is their duty to base their verdict on the law as instructed by the court and that they must all agree to the answers on the verdict forms.

Contrary to plaintiffs' contention, this case is distinguishable from *Gambrell v. Ravin*, 764 P.2d 362 (Colo.App.1988), *aff'd*, 788 P.2d 817 (Colo.1990), because here, the trial court neither encouraged the jury to decide within a set period of time, nor did it suggest consequences the jury may have faced for failure to reach a unanimous verdict.

Under these circumstances, we conclude that the supplemental instructions did not constitute an abuse of discretion.

The judgment is affirmed.

Judge TAUBMAN and Judge FURMAN concur.